Francis B. YENTZER

v.

The PENNSYLVANIA RAILROAD COMPANY, Appellant.

No. 12006.

United States Court of Appeals Third Circuit.

Argued Dec. 17, 1956.

Decided Jan. 9, 1957.

1. Now 8 U.S.C.A. § 1254(a) (1, 2).

Philip Price, Philadelphia, Pa. (Raymond W. Midgett, Jr., Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., on the brief), for appellant.

B. Nathaniel Richter, Philadelphia, Pa. (Richter, Lord & Levy, Philadelphia, Pa., on the brief), for appellee.

Before MARIS, GOODRICH and STALEY, Circuit Judges.

MARIS, Circuit Judge.

This is an appeal by the defendant railroad company from a judgment recovered against it in the District Court for the Eastern District of Pennsylvania by the plaintiff, a locomotive engineer in its employ, for injuries sustained by him in the course of his employment. The suit was brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. and the Boiler Inspection Act, 45 U.S.C.A. § 22 et seq. The evidence disclosed that the plaintiff sustained his injuries under the following circumstances:

The collision in which the plaintiff was injured occurred on May 18, 1951, on the defendant's main line of railroad between the Rosemont and Bryn Mawr stations just west of Philadelphia. The operation of trains on that portion of the defendant's railroad is controlled by automatic block signals along the right of way which are known as wayside signals and by signals in the cabs of the locomotives which are known as cab signals, all of which are electrically operated. There are wayside signals east of Villanova station and west of Bryn Mawr station. The signal at Bryn Mawr is what is known as a home signal, the operation of which may be controlled to some extent by the block operator stationed at the Bryn Mawr signal tower. The arrangements of lights on the wayside signals as well as those shown on the locomotive cab signals indicate to a locomotive crew the speed at which it may travel. The various arrangements of lights authorize speeds that take into account, among other things, any cross-over movement from one track to another, the presence of trains or other obstacles on the track ahead, open switches or broken rails. The arrangements of lights displayed by both cab and wayside signals are altered by changes in coded electrical impulses that travel along the track between wayside signals against the current of main traffic or by the absence of such impulses. The signals are designed to display in the latter case the most restrictive aspect of which they are capable. Changes in the coded electrical impulses which actuate the signals occur automatically as the usability of the track ahead changes.

On the morning of the collision the plaintiff was operating the electric locomotive of passenger train 68 which had left Paoli station proceeding eastwardly on track 2, the second track from the south, at 6:24 A.M. Proceeding eastwardly ahead of it on track 2 was passenger train 36 which had left Paoli at 6:21 A.M. It appeared that train 36 had tripped the dragging equipment detector west of Paoli but inspection of the train there disclosed nothing dragging except a crow which had been caught on a steam line connector. The train had accordingly been authorized to proceed. As it passed Radnor, train 36 again tripped a dragging equipment detector which automatically set the Bryn Mawr home wayside signal at the "stop" position and alerted the operator at the Bryn Mawr tower. When train 36 stopped at the Bryn Mawr home signal its fireman, de Angelis, alighted and telephoned Hurley, the defendant's block operator at the Bryn Mawr tower, to ask the reason. Hurley told de Angelis that his train had tripped the dragging equipment detector at Radnor and that it should be inspected. Although Hurley knew that train 68 was following train 36 on track 2, he did not mention that fact to the fireman. He testified that his reason for not doing so was because train 68 was operating under automatic block and cab signals. Meanwhile as train 36 had slowed down for the Bryn Mawr signal Grove, its flagman, had gathered his flagging equipment and when the train stopped he alighted and walked back along the track to the westward. He had reached a point about 700 feet to the rear of his train when he saw train 68 approaching and waved his flag signalling it to stop.

As we have seen, train 68, operated by the plaintiff, had left Paoli three minutes after train 36, following that train eastwardly on track 2. When train 68 approached the Villanova wayside signal the aspect displayed by the cab signal in

the plaintiff's cab was "approach"[1] and the aspect displayed by the wayside signal was "stop-and-proceed",[2] the most restricted aspect which that wayside signal could display. This was as it should be with train 36 standing in the block between Villanova and Bryn Mawr since the wheels and axles of that train should have short circuited the electric coded impulses emanating from the relay box at the Bryn Mawr home signal and there should accordingly have been no such impulses west of train 36 to activate the Villanova wayside signal. In compliance with that signal the plaintiff stopped train 68 and then proceeded. When the plaintiff's locomotive passed under the Villanova wayside signal into the block ahead his cab signal should have gone down from "approach" to "restricting"[3] to correspond with the aspect that had been shown by the Villanova wayside signal just before the locomotive passed under it and it should have stayed at "restricting" in view of the fact that train 36 was standing in the block at Bryn Mawr. What actually happened to the cab signal at this point is, however, a matter of dispute. The plaintiff testified that when he passed the Villanova wayside signal, his cab signal dropped from "approach" to "restricting", as it should have done under the circumstances, and that he acknowledged the change,[4] but that after running a short distance the cab signal went up to "approach" and, after running fifteen or twenty car-lengths further, went up to "approach-medium".[5] In each cab of an electric locomotive of the type here involved there are two cab signals, one on the right side of the cab for the observation of the engineer and the other on the left side for the observation of the fireman. Ward, the fireman on plaintiff's locomotive, testified that he observed the aspect of the cab signal jump from "approach" to "approach-medium" after passing the Villanova wayside signal and that he did not remember seeing it go down to "restricting". Nor did he remember the warning whistle blowing as the plaintiff had testified. He stated, however, that when the train stopped at the Villanova wayside signal he went over to the engineer's side of the cab and did not return to his own side until after the train had started. He admitted that he did not know what steps his cab signal went through during that period.

Between Villanova and Bryn Mawr the line of the railroad curves first to the right and then, after passing Rosemont station, to the left. Train 36 was standing on track 2 where it had been stopped by the Bryn Mawr home signal a short distance beyond the end of the second of these two curves so that it was not visible for any great distance from the westward. The plaintiff having, as he testified, received an "approach-medium" signal in his cab after passing Villanova, had advanced the speed of his train to 45 miles per hour when, as he rounded the curve between Rosemont and Bryn Mawr, he observed the flagman of train 36 signalling him to stop. It was, however, then too late for him to do so and although he immediately applied the emergency brakes his locomotive collided with

1. "Approach" authorized the train to proceed at medium speed not exceeding 30 miles per hour prepared to stop at the next wayside signal.

2. "Stop-and-proceed" required the train to come to a complete stop before passing under the wayside signal and then to proceed at "restricted" speed. Under "restricted" speed a train may proceed at not exceeding 15 miles per hour prepared to stop short of trains or other obstructions ahead or a switch not properly lined, and to look out for broken rails.

3. Under a "restricting" cab signal aspect a train may proceed at "restricted" speed as defined in footnote 2 supra.

4. There was a warning whistle in the plaintiff's locomotive cab which blew when the cab signal aspect dropped to a more restrictive one. The whistle blew until the engineer, having noted the change of aspect, acknowledged it by operating a foot pedal which shut off the whistle.

5. Ordinarily, an "approach-medium" cab signal aspect at this point on the railroad authorizes a speed of 45 miles per hour.

the rear of the train standing on the track ahead, resulting in a catastrophe in which 10 persons were killed and 196 persons, including the plaintiff, were injured. It is to recover damages for the injuries thus suffered that the plaintiff brought the present suit in which the jury rendered a verdict in his favor for $85,000 and which resulted in the appeal now before us.

On this appeal the defendant makes three contentions. The first is that the trial judge erred in declining to charge the jury that the defendant would not be liable if the sole proximate cause of the accident was the plaintiff's failure to observe the defendant railroad's operating rule that in case of a conflict between wayside and cab signals the more restrictive should be followed.[6] If the cab signal operated as the plaintiff testified, it showed a "false proceed" signal involving a failure of the signal system, in view of the fact that train 36 was in the block, but it did not present a conflict since, for all the plaintiff knew, train 36 might have passed out of the block shortly after his locomotive passed under the Villanova wayside signal. The defendant's contention, however, is predicated upon the proposition that under the conflicting evidence it would have been possible for the jury to find that when the plaintiff's locomotive, after stopping at the Villanova wayside signal which showed a "stop-and-proceed" aspect, passed under that signal his cab signal showed an "approach" aspect rather than a "restricting" one. In this situation, says the defendant, the two signals would have been conflicting with the result that under the operating rule of the defendant railroad it was the plaintiff's duty to follow the more restricted of the two and his failure to do so would have been negligence on his part which, under these circumstances, if the jury found them to exist, would have been the sole proximate cause of the accident.

There are two difficulties with this contention—one factual and the other legal. The first is that the contention assumes that there was evidence from which the jury might have found that the plaintiff's cab signal remained at "approach" after the locomotive passed under the Villanova wayside signal instead of going down to "restricting" and then up to "approach" as the plaintiff testified that it did. But we find no competent evidence in the record to this effect. The defendant relies upon the testimony of Ward, the fireman, as to this but his testimony relates only to his own cab signal and a careful examination of it shows that he was not observing his signal during a crucial part of the period, the time just after starting when the locomotive passed under the Villanova wayside signal. He stated that he did not recall seeing the cab signal show a "restricting" aspect when he observed it but he admitted that he was not observing it during that particular period, having been on the plaintiff's side of the locomotive cab when they were stopped and having crossed over to his own side sometime after starting. In order to support the defendant's contention now under discussion the jury would have had to find that the fireman's cab signal did not go down to "restricting", that the two cab signals even in case of failure must necessarily always show the same aspect and that, therefore, the plaintiff's cab signal must not have shown the "restricting" aspect which the plaintiff testified that it did show. In the light of the plaintiff's positive testimony that he observed his cab signal go down to "restricting" and then up to "approach" and afterward to "approach-medium" and in view of the lack of any evidence that under no circumstances of failure could the two signals in the locomotive cab show different aspects, we think that Ward's testimony was insufficient to support a finding that the cab signal on the plaintiff's side of the cab did not go

6. The defendant's Operating Rule 298 provided: "Should cab signal and fixed sig- nal indications conflict, the more restrictive indication will govern."

down to "restricting" after passing under the Villanova wayside signal.

■ But even if we should assume that there was testimony which would support a finding that the plaintiff was confronted with a conflict between his cab signal and the Villanova wayside signal, it is quite clear that the jury could not have made a finding that the plaintiff's failure to follow the operating rule applicable to a conflict in signals was the sole proximate cause of the accident. Unquestionably such action by the plaintiff, if it took place, would have been negligence on his part or at the very least an assumption by him of the risk of proceeding at a greater speed than the rules permitted and undoubtedly such action would have been in fact one of the contributing causes of the accident. But we are dealing here with a case arising under the Boiler Inspection Act which makes it the absolute duty of the defendant railroad to maintain the safety appliances on its locomotives in good working order at all times.[7] The cab signals were admittedly appurtenances of the locomotive within the meaning of the Boiler Inspection Act. Indeed they were appurtenances designed especially to insure safety. If, therefore, the facts were as the defendant asserts in support of its contention now under discussion their failure to operate properly was a concurring proximate cause of the accident. Indeed in the present suit by the plaintiff, insofar as it is based on the Boiler Inspection Act, such failure of the cab signals to operate properly would have to be regarded in law as the sole cause since neither the plaintiff's contributory negligence nor his assumption of the risk may be set up as defenses in a suit under that Act.[8]

The case of McCarthy v. Pennsylvania R. Company, 7 Cir., 1946, 156 F.2d 877, certiorari denied 329 U.S. 812, 67 S.Ct.

635, 91 L.Ed. 693, is directly in point. It was a suit by the personal representative of a deceased locomotive engineer. It appeared that his locomotive developed a hot box which was called to his attention several times and which he ignored, continuing to operate the locomotive until as a result of the hot box the pony truck broke down causing the locomotive to turn over and killing him. In that case the defendant likewise asserted in its defense that the engineer was solely responsible for the accident because of his negligence in failing to heed the warnings given to him as to the hot box. In discussing this defense Judge Minton, speaking for our brethren of the Seventh Circuit, said 156 F.2d at page 881:

"The defendant's answer tendered the issue that the sole proximate cause of the accident was the fact that the decedent continued to use the locomotive after he knew of its defective condition and failed to report it as was his duty under the rules. These acts constituted no defense. The decedent's acts were all concurring acts with the act of the defendant in violation of the statute, and were either acts of contributory negligence or assumption of the risk of known danger, from both of which, as we have pointed out, the decedent had been relieved by the statute. ' * * * But where, as in this case, plaintiff's contributory negligence and defendant's violation of a provision of the safety appliance act are concurring proximate causes, it is plain that the employers' liability act requires the former to be disregarded.' Spokane & Inland Empire R. Co. v. Campbell, 241 U.S. 497, 510, 36 S.Ct. 683, 689, 60 L.Ed. 1125."

■ We are in agreement with the rule applied in the McCarthy case. Ac-

7. Myers v. Reading Co., 1947, 331 U.S. 477, 485, 67 S.Ct. 1334, 91 L.Ed. 1615; Coray v. Southern Pacific Co., 1949, 335 U.S. 520, 69 S.Ct. 275, 93 L.Ed. 208; Urie v. Thompson, 1949, 337 U.S. 163, 188–189, 69 S.Ct. 1018, 93 L.Ed. 1282.

8. Federal Employers' Liability Act, §§ 3, 4, 45 U.S.C.A. §§ 53, 54. See Urie v. Thompson, 1949, 337 U.S. 163, 188, 69 S.Ct. 1018, 93 L.Ed. 1282.

cordingly we conclude that the trial judge did not err in declining to charge the jury as requested by the defendant in this regard.

■ The defendant's next contention is that the trial judge erred in charging the jury that it might find that the defendant's employee Hurley, the Bryn Mawr tower operator, was negligent in not informing the fireman of train 36 of the approach of train 68 and that the defendant's employee Grove, the flagman of train 36, was negligent in failing to give the plaintiff earlier warning of the presence of the standing train 36 and that their negligence was a contributing cause of the collision.[9] The trial judge did so charge the jury and we think he was entirely right in doing so. The defendant contends that neither of these employees had reason to know that adequate warning had not already been given to the plaintiff of the presence of train 36 by the operation of the automatic wayside and cab signals. It asserts that the failure of Hurley, the tower operator, to inform the fireman of train 36 that train 68 was following on the same track was not improper in view of the fact that the trains were operating in cab signal territory and that for the same reason the failure of Grove, the flagman, to walk farther to the rear of train 36 so as to be in a position to give a more adequate warning to the plaintiff approaching in train 68 was not improper. It may well be that the defendant is right in both of these contentions. Certainly the jury could have found under the evidence that neither of these employees was negligent. We are satisfied, however, that in the case of each the question as to whether he exercised due care for the safety of train 36 was one of fact for the jury under all the circumstances disclosed by the evidence and that the trial judge properly submitted that question to the jury.

■ Finally the defendant contends that the trial judge erred in admitting evidence of alleged other cab signal failures which was offered by the plaintiff for the purpose of impeaching the testimony of Errickson, the general foreman in the office of the system electrical engineer of the defendant railroad company, who had been called by the plaintiff to testify with respect to the operation of the defendant's automatic signal system. The evidence in question was offered to contradict Errickson's testimony to the effect that if there was a train ahead in the block in automatic block signal territory it was inconceivable to him that one could get a more favorable reading on the locomotive cab signal than "restricting". The defendant's contention in this regard is that Errickson did not so testify and that the impeaching testimony was consequently inadmissible. The short answer to this contention is that the defendant is wrong for the fact is that Errickson did so testify. His statement to that effect appears on page 361 of the typewritten transcript of the testimony. In view of this testimony we are satisfied that the admission of the impeaching testimony in question was entirely within the discretion of the trial judge who carefully restricted its use to impeachment by explicit instructions given to the jury at the commencement of each witness' testimony.

The judgment of the district court will be affirmed.

9. The defendant contends that this ground of negligence was not sufficiently pleaded but we regard paragraph 11 of the complaint as adequate for that purpose.