JEFFREY BAKER, Plaintiff-Appellee, v. CSX TRANSPORTATION, INC., Successor in Interest to Baltimore and Ohio Railroad Company and Chesapeake and Ohio Railroad Company, Defendant-Appellant.

Fifth District   No. 5—90—0366

Opinion filed October 25, 1991.

122

Richard F. Nash, of Law Offices of William A. Brasher, of St. Louis, Missouri, for appellant.

Timothy O. O'Sullivan, of Pratt & Callis, P.C., of East Alton, for appellee.

JUSTICE WELCH delivered the opinion of the court:

Defendant, CSX Transportation, Inc., successor in interest to Baltimore & Ohio Railroad Company and Chesapeake & Ohio Railroad Company, appeals from both the judgment entered on February 22, 1990, on the jury verdict in favor of plaintiff, Jeffrey Baker, in the amount of $1 million on count III of his amended complaint and the May 10, 1990, order of the circuit court of St. Clair County denying defendant's post-trial motion to set aside said verdict. Count I of plaintiff's original complaint sought damages for personal injury pursuant to the Federal Employers' Liability Act (45 U.S.C. §51 *et seq.* (1976)) and was dismissed with prejudice by plaintiff prior to trial. Count II of the original complaint sought damages for injuries caused by defendant's alleged violation of the Safety Appliance Act (45 U.S.C. §1 *et seq.* (1976)) and was dismissed by plaintiff at the completion of the evidence. Count III of plaintiff's complaint, as amended, sought damages for injuries predicated on defendant's alleged violation of the Boiler Inspection Act (45 U.S.C. §23 *et seq.* (1976)) (hereinafter the Locomotive Inspection Act or the Boiler Inspection Act) and was the sole cause of action submitted to the jury for deliberation.

Plaintiff alleged in count III of his amended complaint that on February 5, 1987, while he was employed by defendant as a trainman, a defect in the engine's appurtenances pulling the train upon which he was working caused a malfunction in the dynamic braking system of said engine in violation of the Locomotive Inspection Act (45 U.S.C. §21 *et seq.* (1976)) and that he was injured in whole or in

part as a result of this violation. Defendant denied that the Locomotive Inspection Act was applicable to this case under the circumstances set forth in plaintiff's complaint, denied that the Act was violated, and denied that plaintiff was injured in whole or in part by a violation of the Act. As an affirmative defense to this count of the amended complaint, defendant stated that the sole proximate cause of any injury sustained by plaintiff was plaintiff's own conduct.

Plaintiff had moved for an *in limine* order prior to trial seeking, *inter alia*, the preclusion of testimony on the issue of one of defendant's affirmative defenses, whether negligence on plaintiff's part was the sole proximate cause of his injury, barring any recovery. Plaintiff had argued that where injuries are alleged to be caused by violation of either the Safety Appliance Act or the Locomotive Inspection Act, any comparative negligence on the part of the plaintiff is not to be considered by the jury in assessing damages. The court denied this part of plaintiff's pretrial motion *in limine*, finding that until plaintiff had established in his proof at trial a violation of the Safety Appliance Act or Locomotive Inspection Act and had brought in some evidence that the violation was the cause in whole or in part of plaintiff's injury, defendant would be allowed to proceed on that defense and to raise it, at its own peril, in its opening statement to the jury.

Plaintiff renewed his motion *in limine* during defendant's cross-examination of the engineer, Thomas Kiser, after objecting to a question concerning a conversation Kiser had with plaintiff following the accident. Defendant's offer of proof indicated that Kiser would testify that plaintiff asked him, "[W]hat should I tell them happened[?]" and that Kiser had replied "just tell them what happened." The court granted the motion *in limine* with respect to this piece of evidence because it bore only on the issue of plaintiff's credibility and plaintiff had not yet testified. Moreover, the court noted that the probative value of this evidence as to the sole-cause issue was tenuous and was outweighed by its prejudicial effect as to an implication of plaintiff's contributory negligence.

During defendant's cross-examination of the plaintiff, he was asked whether he had told the conductor, Harold Spears, who was the first person who arrived at the scene of the accident, that it was his fault that the accident had happened. Plaintiff objected that the question was in direct violation of the court's previous ruling on his motion *in limine*, and he moved to strike defendant's affirmative defense that plaintiff's conduct was the sole proximate cause of

his injuries. The court found that there had been no evidence presented at this point with regard to any acts of plaintiff independent of the causative chain resulting from the alleged defect, and that the question of the existence of the defect was for the jury to decide. Accordingly, the court granted plaintiff's renewed motion to strike the sole-cause affirmative defense, instructed the jury to disregard the question to which plaintiff had objected, and barred any further cross-examination of plaintiff or examination of any other witness on this issue. Defendant twice moved for a mistrial; once after granting the motion *in limine* during Kiser's cross-examination and again after the court struck defendant's affirmative defense during plaintiff's cross-examination. Defendant's motions for mistrial were both denied. The court allowed defendant to make an offer of proof with Spears during its case in chief. In said offer of proof Spears testified that when he first arrived at the scene of the accident, plaintiff had said to him, "It's my fault."

Defendant argues in this appeal that the circuit court's action in striking its affirmative defense prior to the presentation of its defense was, in effect, the direction of a verdict on the issue of plaintiff's conduct being the sole proximate cause of his injury, and that the court erred in so directing a verdict on this issue. Defendant further argues that the circuit court erred in failing to grant its motion for a mistrial following the court's decision to direct a verdict on the issue of sole proximate cause and in barring any further testimony on that issue. Defendant contends that because of this error it did not receive a fair trial, and defendant seeks the reversal of the February 22, 1990, judgment and a remand to the circuit court of St. Clair County for a new trial on all issues. For reasons stated as follows, we affirm.

The following evidence, pertinent to the issues involved in this appeal, was adduced at trial prior to the order striking defendant's affirmative defense. On February 4, 1987, at about 9:14 p.m., the train on which plaintiff was working for defendant railroad as head brakeman left Louisville, Kentucky, headed north for Cincinnati, Ohio. Thomas Kiser operated the locomotive engine and Harold Spears was the conductor. Plaintiff and Spears rode with Kiser in the locomotive engine. The train was approximately 1 to 1½ miles in length, with a consist of 3 diesel engines, 38 loaded cars, 68 empty cars, and a caboose. The train made a stop at the Obanyon sidetrack to pick up a bulkhead flatcar loaded with lumber, which was to be delivered to the spur near Quality Forest Products off the CSX main line near Walden, Kentucky. The flatcar was con-

nected near the front of the train, behind the third engine. Kiser testified that when they reached the Quality Forest spur the head brakeman was to disconnect the flatcar from the train and switch it onto the spur track at the industry. He stated that it was approximately 3 a.m. when they reached Quality Forest Products. There was no artificial lighting at the spur.

The terrain between Louisville and Quality Forest has very many hills and some are quite steep. The Quality Forest spur is located at milepost 88, and engineer Kiser testified that he began slowing down around milepost 86 to make the stop. Kiser described the terrain between milepost 88 and milepost 86 as a "bowl," at the bottom of which the train had to traverse a bridge that crossed Interstate 75. The descending grade starts three-fourths of a mile south of the bridge at milepost 86 and ascends for approximately three-fourths of a mile north of the interstate to reach the stop at the Quality Forest Products spur.

Kiser explained that he had available three different methods of stopping a train: the automatic brake system, the independent brake system, and the dynamic brake system. He testified that the dynamic braking system was, at the time, the preferred and primary braking system because it was more economical in terms of brakeshoe wear and maintenance. Kiser also testified that the Chessie System train-handling manual instructed engineers to use the dynamic brakes in order to properly control slack action on freight trains, and that proper control of slack is essential at all times. Kiser explained that the dynamic braking system works by taking the traction motors and reconnecting them as generators, which causes a retarding force against the forward movement of the train. The eight-position throttle used to control the forward power of the traction motor is also used to control the dynamic brake, with the first position being the weakest to the eighth position being the strongest control of the dynamic brake. Before switching from forward throttle power to dynamic brake, however, the engineer must bring the throttle down to "0" and wait 10 seconds before applying the first position on the dynamic brake.

The second braking system available to the engineer is the independent brake which works only to apply and release the brakes on the locomotives. The third braking mechanism on the train is the automatic or air braking system. Its operation involves a system of brakes for each car of the train, controlled through release and setting of air pressure that connects through the cars by way of hoses located in the area of the drawbar coupling mechanism at the "an-

gle cock" valve. By manipulating air pressure on the cars the engineer can bring the train to a stop. The automatic brake is operated by a separate brake valve handle located on the locomotive control panel. Its four positions range from "off," minimum (five to eight pounds) reduction zone, service (over eight pounds) reduction zone, and emergency application zone.

With the automatic braking system, Kiser explained, any time there is an application or release of the air pressure the train will respond with an inward movement of "slack." Slack is the ability of each car to move in and out, about a foot in distance, that is built into the draft gear on each end of a car. The purpose of slack is to allow the locomotive to start the train, one car at a time, and the movement is caused by one portion of the train moving faster in relation to another portion of the train. When slack runs in on a train it is a movement from the rear of the train forward to the locomotive. Kiser testified that the slack action of the train, which can range in force from relatively mild to violent, must be controlled in order to avoid train derailments and damage to cars or the lading on the cars. Use of the dynamic brake system will allow the train to create a uniform movement of the train without any abrupt changes in forward or reverse motion, by keeping the slack in the train fully compressed. Use of the automatic brakes, however, will cause the slack to bunch up in certain sections of the train and stretch out in others, depending on the positioning of the loaded and unloaded cars.

Kiser testified that although he was not certain of the exact track location in which he went into dynamic braking, he first experienced difficulty with the dynamic brake system when he applied them for the stop at Quality Forest. At this time he estimated that the train was traveling approximately 30 to 35 miles per hour. He testified that he was descending from milepost 86 when he noticed that the dynamic brakes were operating other than normal. He reached that conclusion because the amperage gauge on the control panel of the locomotive was fluctuating, when it should have been displaying a steady reading that would relate closely to the throttle position the engineer was using.

He could not recall what throttle position he had reached with the dynamic brakes, although he believed it was likely to have been below the fifth position. This testimony was impeached by reference during cross-examination to Kiser's discovery deposition testimony in which he stated that he had reached the eighth position in dynamic braking before he noted the problem. Because the dynamic

brakes were not operating properly, Kiser testified, he determined to use a minimum reduction application of the automatic brakes to assist the dynamic brake in slowing the train. Kiser admitted that it was not unusual to supplement the dynamic brake with the automatic brake to control the train's speed on steep grades on the Louisville run, though he noted that the grade at milepost 86 was not as steep as most on this northbound run.

Application of the automatic brakes, Kiser opined, caused the slack on the rear end of the train to stretch out. Kiser also stated that after changing over to another braking system, or using it in conjunction with the dynamic brakes, he would no longer have control over the slack. He released the automatic brake on the north side of the bridge because at that point the grade ascends toward the Quality Forest spur. He estimated that the train was traveling at approximately 25 miles per hour at this time. Kiser opined that it takes three to four minutes for the automatic brakes to release all the way to the rear end of the train and that it could have taken three to four minutes for the train to travel from the north side of the bridge to Quality Forest.

Kiser testified that plaintiff and their conductor, Mr. Spears, got off the locomotive several car lengths before they reached the switch at the Quality Forest Products spur. Plaintiff testified that the train was not moving very fast at this point. Kiser had, at this time, completely released the dynamic brake. Kiser made another application of the automatic brakes in this area in order to stop the train at the approximate point the conductor had told him he wanted to stop the train in order to switch the flatcar into the industry. He did not recall going into forward throttle in order to travel forward the final 80 feet to the stopping point.

Spears proceeded to remove the derail from the track on the industrial spur so that the flatcar could be put into the siding. Plaintiff walked back to the area where they had discussed stopping the train so that the flatcar could be disconnected from the rest of the train. Plaintiff testified that he was carrying a lantern and walkie-talkie as he went to the location of the loaded flatcar which was to be derailed. He signaled to the engineer to stop. Kiser testified that in addition to use of the automatic brake, he used the independent brake to make the final stop of the train.

Plaintiff testified that he proceeded between the flatcar and the covered hopper car immediately behind the flatcar, in order to disconnect the air hoses from the train's air braking system. In order to do this he had to reach the angle cock and move the handle par-

allel to the ground. Plaintiff testified that because he could not reach the angle cock to close it, he had to cross over to the other side of the cars. He testified that he climbed up the ladder on the hopper car to the crosswalk grid in front of the car.

Plaintiff testified he was facing the car as he side-stepped along the crosswalk and that he was holding onto the hopper-car handhold with one hand, the lantern was around his wrist, and he was holding the walkie-talkie with three fingers of the other hand. As plaintiff was taking a step, he felt the slack come in from the back of the train, he dropped his radio, and as he swung around, his left foot went down onto the drawbar of the flatcar, perpendicular thereto. He was still holding on with his right hand and his right foot was still on the cross-walk when the slack action forced the spring-type drawbar under the flat car. Plaintiff's left foot was caught between the knuckle which couples the drawbars of the two cars and the body of the flatcar. It was later determined that the toes and a portion of his left foot behind the toes would have to be amputated because of the injury.

Engineer Kiser reported the accident to a dispatcher in Cincinnati, who arranged for an ambulance to transport plaintiff to the hospital. Kiser admitted that he had not reported a cause of the accident when he spoke to the dispatcher. He also admitted that before the train returned to the Cincinnati terminal he had spoken by radio with Dale Couch, who was investigating the accident for defendant, and that he had not told Couch that he had been having any trouble with the dynamic brakes on that train. Kiser testified that he was required to make out an accident report after the train reached the Cincinnati terminal. He gave a verbal statement to Mr. Wittenberg, the road foreman of engines at the Cincinnati terminal, that the engine was having problems with its dynamic brakes. He testified that the statement was later transcribed into a formal report wherein he was reported to have stated that the amperage was fluctuating up to the one- to three-throttle position in dynamic braking and that the wheel-slip light was illuminated on the lead unit. He also turned in a locomotive inspection report at the end of his run and therein stated that the failure of the dynamic braking system was a maintenance problem that needed to be corrected.

Kiser testified that if the wheel-slip warning light is illuminated, this indicates that one or more wheels on the locomotives are slipping and the engineer should discontinue use of the dynamic brakes. Kiser admitted, however, that it was possible to run the dynamic-brake position into the eighth position, after originally having

an amperage fluctuation in the lower positions, and not to have an amperage fluctuation or wheel-slip warning in the higher position. He stated that he did not know whether or not this indicated a problem with the dynamic brakes.

Section 23 of the Federal Locomotive or Boiler Inspection Act provides:

> "It shall be unlawful for any railroad to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such railroad without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of this Act and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for." (45 U.S.C. §23 (1976).)

An action for a violation of the Boiler Inspection Act is prosecuted as an action under the Federal Employers' Liability Act (FELA) (45 U.S.C. §51 *et seq.* (1976)) and the FELA causation standard applies. (*Green v. River Terminal R.R. Co.* (6th Cir. 1985), 763 F.2d 805, 810.) The Federal Employers' Liability Act makes railroads liable in damages to any employee suffering "injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliance, machinery, track, roadbed, works, boats, wharves, or other equipment." (45 U.S.C. §51 (1976).) These two Acts are *in pari materia* and must be construed together. (*McCarthy v. Pennsylvania R. Co.* (7th Cir. 1946), 156 F.2d 877, 880.) A violation of the Boiler Inspection Act is treated as negligence *per se* authorizing an action under section 51 of the FELA. (*McCarthy*, 156 F.2d at 880.) Liability imposed by the Locomotive or Boiler Inspection Act is absolute upon proof of the unsafe part and proximate cause. (*Green*, 763 F.2d at 810.) While plaintiff need not establish that a defect was the sole cause of the injury, where there has been a failure of the required appliance there is liability only where the failure creates a condition under which, or incidental situation in which, the employee is injured and where the defective appliance is itself an efficient cause or the instrumentality through which the injury is directly brought about. *Green*, 763 F.2d at 810.

Defendant first contends that the striking of its sole-proximate-cause defense and the barring of any further evidence on that point during plaintiff's case was an unfounded and untimely directed verdict and an invalid use of an order *in limine*. As noted above, plaintiff moved prior to trial for an *in limine* order that defendant should be barred from going into the question of plaintiff's conduct being the sole proximate cause of his injury because actions under the Safety Appliance Act or Boiler Inspection Act are strict liability and the employee's alleged contributory negligence or comparative fault is not to be considered. In cases predicated on violation of the Boiler Inspection and Safety Appliance Acts, contributory negligence may not be considered in mitigation of damages. (See 45 U.S.C. §53 (1976).) Defendant's theory of the case, however, was expressed during its argument against the motion *in limine*. Defendant's attorney proposed that the facts of the case would probably show that plaintiff stepped up on a drawbar in trying to get between the cars and that this was the sole proximate cause of his injury and damages, even if the proof also showed a violation of the Boiler Inspection Act.

Defendant correctly argued at the pretrial motion *in limine* hearing that the substantive law recognizes that if the negligence of the employee is the sole cause of the injury or death, there is no liability. (*Page v. St. Louis Southwestern Ry. Co.* (5th Cir. 1965), 349 F.2d 820, 827.) The railroad in appropriate circumstances may raise a sole-cause defense (*Maldonado v. Missouri Pacific Ry. Co.* (5th Cir. 1986), 798 F.2d 764, 767), for example, where the railroad can show that an intervening and independent cause was the causative factor in the plaintiff's injuries (*O'Donnell v. Elgin, Joliet & Eastern Ry. Co.* (1949), 338 U.S. 384, 394, 94 L. Ed. 187, 194, 70 S. Ct. 200, 206). For an intervening act, omission, or event to be the sole proximate cause, it must be, by itself, the direct and immediate cause of the injury, or must be a cause which so entirely supersedes the operation of the defendant's negligence that it alone, without the defendant's negligence contributing thereto in the slightest degree, produces the injury. (57A Am. Jur. 2d *Negligence* §611 (1989).) As the court correctly noted in ruling against plaintiff's pretrial motion *in limine*, plaintiff had to show some causal relationship in his proof at trial between the violation of the Act and plaintiff's injuries, in order to recover.

It is patent, however, that if plaintiff's negligence was the *sole* cause, then the violation of the Acts could not have contributed in whole or in part to the injury. (*Beimert v. Burlington Northern,*

*Inc.* (8th Cir. 1984), 726 F.2d 412, 414.) It is equally clear that proof of violation of the safety appliance statutes without more proves negligence and also eliminates contributory negligence as a consideration for any purpose, with causation the only issue then remaining. (*Rogers v. Missouri Pacific R.R. Co.* (1957), 352 U.S. 500, 507 n.13, 1 L. Ed. 2d 493, 499 n.13, 77 S. Ct. 443, 449 n.13.) It is for this reason that an instruction on the sole-proximate-cause defense is not favored because of its tendency to "distract the jury's attention from the simple issues of whether the carrier was negligent and whether that negligence was the cause, in whole or in part, of the plaintiff's injury." *Page*, 349 F.2d at 827.

Plaintiff contended that *Yentzer v. Pennsylvania R.R. Co.* (3d Cir. 1957), 239 F.2d 785, was dispositive of his pretrial motion *in limine*. In *Yentzer*, the plaintiff had alleged a violation of the Boiler Inspection Act and the defendant had sought to defend on grounds that plaintiff's contributory negligence was the sole proximate cause of the accident. On appeal the defendant contended that the trial judge erred in refusing to charge the jury that defendant would not be liable if the sole proximate cause of the accident was the plaintiff's failure to observe the defendant railroad's operating rule that in case of a conflict between wayside and cab signals, the more restrictive should be followed. The reviewing court found no such error because any violation of a duty on plaintiff's part in following a railroad rule was a concurring proximate cause of the accident along with a defective mechanism which was proved to have violated the Boiler Inspection Act. The court held that the failure of the cab signals to operate properly would have to be regarded in law as the sole proximate cause since neither plaintiff's contributory negligence nor his assumption of the risk may be set up as defenses in a suit under the Boiler Inspection Act. *Yentzer*, 239 F.2d at 790.

The court in the instant case relied on *Beimert v. Burlington Northern Inc.* (8th Cir. 1984), 726 F.2d 412, in ruling against plaintiff's pretrial motion *in limine*, holding that until a factual question was raised at trial as to the issues of violation of the Act and causation, it would allow introduction of evidence on the sole-proximate-cause defense. The court stated, however, that plaintiff's motion *in limine* may later become appropriate, depending upon how the facts came out in the case. The court later distinguished the factual situation set forth in the *Beimert* case in ruling on plaintiff's motion to strike. In the *Beimert* case, founded on a violation of the Safety Appliance Act, the plaintiff had been injured in the

process of repairing an alleged defect rather than as a result of misoperation caused by the defect. Accordingly, the court below noted that, unlike the instant case, in *Beimert* there was evidence of intervening independent causation on plaintiff's part. Instead the court found that *McCarthy v. Pennsylvania R. Co.* (7th Cir. 1946), 156 F.2d 877, provided the "roadmap" for the court's determination of whether testimony in support of the sole-proximate-cause defense should be admitted in these strict liability cases.

In *McCarthy*, wherein plaintiff had predicated liability on defendant's violation of the Boiler Inspection Act, defendant had tendered in its answer that plaintiff's decedent's conduct was the sole proximate cause of the fatal accident. The court on review found no evidence of any independent acts of negligence on decedent's part but that the decedent's acts in continuing to use a defective locomotive after discovering that it had a defective "hot box" were acts concurrent with the railroad's violation of the Boiler Inspection Act. Accordingly, the court reversed a judgment entered on jury verdict in favor of defendant because of an erroneous sole-proximate-cause instruction which the court found to have confused and misled the jury into believing that decedent could be charged with sole liability for the accident because of his concurrent negligent conduct. (*McCarthy*, 156 F.2d at 882.) The court in the instant case found that the testimony, as per defendant's offer of proof, related to a concurrent rather than independent act of negligence on plaintiff's part. The court held that "based on the detailed direction of the Seventh Circuit in *McCarthy* and the other cases referred as authority by counsel, and in light of the facts already in evidence and the evidence that was represented by counsel to be anticipated during the trial, the affirmative defense of sole proximate cause should be stricken and no further testimony with regard to that issue should be permitted."

■ Although the *McCarthy* case deals with the propriety of giving a sole-proximate-cause instruction to the jury, we also believe that it provides persuasive argument in support of striking the affirmative defense and barring admission of further evidence on this issue by way of the court's *in limine* order during plaintiff's case in chief. A "motion in limine" allows a party to obtain an order excluding inadmissible evidence without having to object to, and thereby to emphasize, the evidence before the jury and thus enables a party to prevent his opponent from attempting to prejudice the jury. (*Department of Public Works & Buildings v. Roehrig* (1976), 45 Ill. App. 3d 189, 197, 359 N.E.2d 752, 759.) We agree with the

court below, based on our review of the relevant case law, that the determinative factor in whether or not to allow evidence of sole proximate cause depends on whether plaintiff's alleged conduct concerns concurrent rather than independent acts of negligence. This, in turn, depends on whether plaintiff's proof at trial shows a defect under the Act and a causative relationship between the defect and plaintiff's injury. If plaintiff has presented such evidence, defendant's offering of evidence concerning plaintiff's contributory negligence is irrelevant, immaterial, and, of course, highly prejudicial.

Defendant contends that it was prevented from exploring whether plaintiff had stepped directly onto the coupler or was standing or crouching on the coupler when the slack came in, or from showing that plaintiff's version of the occurrence at the scene defied a simple misunderstanding of the mechanics of motion and time such that he was the sole cause of his injury, and that climbing or standing on a drawbar is unsafe and a violation of the company rules. Defendant had argued in opening statement that it would have been physically impossible for plaintiff to have been driven off the walkway and step his foot onto the drawbar when the slack came in instantaneously, driving the cars together. Plaintiff admitted on cross-examination that crossing over by stepping up onto a drawbar was a railroad safety rule violation. However, as plaintiff pointed out during argument of his motion to strike, there was no evidence that plaintiff was crossing over by way of the drawbar when the slack came.

■ Our review of the examination and cross-examination objected to by plaintiff and ruled subject to the *in limine* order, as well as the offers of proof preserved by defendant in the record, indicate to us that defendant was trying to admit into evidence testimony concerning statements plaintiff had made that the accident had been his fault, implying that plaintiff had indeed crossed over at the drawbar, thus failing to follow a railroad safety rule. Such testimony could not help but prejudice the jury against plaintiff's case. More importantly, where, as here, plaintiff proceeded to trial solely on the Safety Appliance Act and Boiler Inspection Act claims where liability is absolute upon proof of a defect and proximate cause, the admission of evidence concerning the violation of a safety rule could have seriously confused and misled the jury despite a successful proof of his case under the Boiler Inspection Act. (See *Howard v. Baltimore & Ohio Chicago Terminal R.R. Co.* (1945), 327 Ill. App. 83, 99-100, 63 N.E.2d 774, 781.) As such, this evidence concerned a concurrent rather than independent act of

negligence on plaintiff's part, which is irrelevant and inadmissible in a case founded on a violation of the Boiler Inspection Act. Indeed, the court below expressed its concern at the pretrial motion *in limine* hearing that a sole-proximate-cause issue raised by the defense could be a back-door way of getting around the prohibition against evidence of contributory or comparative negligence.

Moreover, the defense theories which defendant claims it was precluded from exploring by way of the *in limine* order are sufficiently akin to a former category of assumption-of-the-risk defense cases known as the "primary duty" rule. The 1939 amendments to the FELA abrogated the defense of assumption of the risk in all cases where the injury proximately resulted from the negligence of the carrier. (53 Stat. 1404 (1939), codified at 45 U.S.C. §54 (1976); *Tiller v. Atlantic Coast Line R.R. Co.* (1943), 318 U.S. 54, 87 L. Ed. 610, 63 S. Ct. 444.) However, a substantial number of cases, both before and after the 1939 amendment, recognized that an employee having the "primary duty" may be denied recovery because of his violation of a specific order or general rule of the railroad. (Annot., 59 A.L.R.2d 580, 644 (1958); see, *e.g., Davis v. Kennedy* (1924), 266 U.S. 147, 69 L. Ed. 212, 45 S. Ct. 33; *Unadilla Valley Ry. Co. v. Caldine* (1928), 278 U.S. 139, 73 L. Ed. 224, 49 S. Ct. 91.) As the court in *Tiller* noted, however, in disposition of these cases the question of a plaintiff's assumption of the risk was frequently treated as another way of appraising defendant's negligence (*Tiller v. Atlantic Coast Line R.R. Co.* (1943), 318 U.S. 54, 64, 87 L. Ed. 610, 616, 63 S. Ct. 444, 449); in other words, whether there was any evidence that defendant was the proximate cause of plaintiff's injuries (*Rocco v. Lehigh Valley R.R. Co.* (1933), 288 U.S. 275, 279, 77 L. Ed. 743, 746, 53 S. Ct. 343, 344). Following the 1939 amendment, the "primary duty" rule was applied to deny recovery on the theory that the injured employee's violation of the duty constituted the *sole proximate cause* of his injuries or death. (Annot., 59 A.L.R.2d 644 (1958); *e.g., Helton v. Thomson* (1941), 311 Ill. App. 354, 363-64, 36 N.E.2d 267, 272.) We cannot help but conclude from this discussion that whether plaintiff's alleged conduct is called contributory negligence, assumption of the risk, or sole proximate cause, defendant's liability is still absolute in Boiler Inspection Act or Safety Appliance Act cases if plaintiff establishes a violation of the Act and a causative relationship between the violation and his injuries.

Defendant argues that the *in limine* order was, in effect, a directed verdict on its affirmative defense, prematurely entered

where defendant had not yet had its opportunity to present any evidence, citing *Micklos v. Highsmith* (1986), 149 Ill. App. 3d 779, 500 N.E.2d 1154, in support of this proposition. The standard for directing of verdicts is well established, to wit:

> "[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.)

The court in the *Micklos* case found that a plaintiff's motion for a directed verdict is usually made after defendant has presented his case, since the court is required under *Pedrick* to examine all of the evidence in the light most favorable to defendant before it makes its ruling, and so the denial of such motion prior to the presentation of the defendant's case is proper. *Micklos,* 149 Ill. App. 3d at 787, 500 N.E.2d at 1160.

Plaintiff, however, argues that the trial court's granting of the motion to strike did not rise to the level of a directed verdict and, accordingly, entry of the *in limine* order was not in error, because in granting the motion to strike the court was simply preventing the admission of irrelevant evidence which could only serve to cloud the issue and confuse the jury. Plaintiff further argues in this appeal that defendant was attempting to inject evidence of plaintiff's allegedly negligent conduct under the guise of "sole proximate cause," in contravention of the statute which says, "the defendant is liable for its acts, but the [plaintiff] is not liable for his," citing *McCarthy* (156 F.2d at 881). Because the burden was on plaintiff to show that his injury proximately resulted wholly or in part from the railroad's negligence (*Chicago, St. Paul, Minneapolis & Omaha R.R. Co. v. Arnold* (8th Cir. 1947), 160 F.2d 1002, 1006), or in the instant case, a violation of the Boiler Inspection Act, we believe our decision concerning the legal propriety of the motion to strike and the *in limine* order when the same were ruled upon during plaintiff's case must be resolved by examining whether plaintiff had introduced sufficient evidence at this point in the case of the dynamic brake defect and the causative connection with plaintiff's injury.

Following argument of plaintiff's motion to strike, the court found that at this point in the trial there was evidence that there was some malfunction in the dynamic braking system, that there was some causation between that defect and the plaintiff's injury, and that there was no evidence with regard to any acts of the

plaintiff independent of the causative chain resulting from the defect. We must agree with the findings of the court in the instant case that plaintiff had adduced evidence to establish a *prima facie* case at the time the motion to strike was made. Plaintiff presented evidence by way of engineer Kiser's testimony that there was a problem with the dynamic brakes as shown by the amperage fluctuation and the wheel-slip warning light. Kiser testified that because of this problem with the dynamic braking system, he had to make application of the automatic brakes which would cause the slack to stretch out in certain sections of the train. Kiser testified that use of the dynamic braking system, alone, would have kept the slack compressed or bunched together. Kiser and plaintiff testified that the train made only one stop at Quality Forest and that the slack ran in after the train stopped. Finally, plaintiff testified that the slack action caused him to lose his footing on the crosswalk and step onto the drawbar and force the drawbar under the flatcar, crushing his forefoot between the body of the flatcar and the coupling mechanism.

Although such evidence was capable of being rebutted by competent evidence, it was within the court's province to determine at this point that plaintiff's Boiler Inspection Act case could go to the jury with the questions of a defect in the dynamic braking system and the causative connection with the accident which resulted in amputation of a portion of plaintiff's left foot. Any evidence that by stepping onto the drawbar plaintiff violated, and knew he was violating, a long-standing rule of the railroad could only have been considered a concurrent act of negligence on his part, irrelevant to the jury's deliberation of the Locomotive Inspection Act claim.

Moreover, as the court below noted in ruling on the motion to strike, defendant was free to present evidence disputing the defect in the dynamic brake system or causation between any defect and the injury. Indeed, Dale Couch, master road foreman of engines for defendant, testified to the defense theory that there was no defect in the dynamic brakes. Couch testified that in this capacity he supervises, evaluates, and trains locomotive engineers, and he estimated that he travels the Louisville to Cincinnati line of track an average of 17 trips per month. It was Couch's opinion, based on the testimony at trial, that the wheel-slip light only indicates a wheel slip, not a defect in the engine. Couch explained that if the engineer had run the engine throttle down from eight to zero and failed to wait a full 10 seconds before moving the lever from power to dynamic brake, there would be a power surge in the traction motor

and possibly a wheel slip. Alternatively, Couch opined that the engineer could have advanced the dynamic brake from "0" to the third position too quickly, sending too much current and possibly causing the wheels to slip. He further opined that if the train had been traveling at 30 to 35 miles per hour when the dynamic brake was applied to make the stop at the Quality Forest Products spur, it would have been necessary, in order to have been able to reduce the speed sufficiently to allow the trainmen to drop off and signal the stop at the spur, to have also applied the automatic brakes. Defendant was also able to present evidence impeaching Kiser's recollection of the dynamic-brake misoperation and the ordinary use of the automatic brakes to supplement the dynamic braking system on the Louisville to Cincinnati run.

In addition, conductor Spears testified to the defense theory that the train had come to a complete stop when it let plaintiff and Spears off the locomotive in order to initiate the switching process and that he had heard the engine revving up to pull the train forward, coming to a second stop when signaled to do so by plaintiff. Defendant also cross-examined engineer Kiser as to the issue of whether the train had come to a complete stop before pulling forward to the derailing position. Couch also gave an opinion that if the final stop was made with the automatic brakes, there could not have been any movement in, once the brake was set, but if the engineer had stopped the movement with the independent brake on the locomotive engines, the engines would have buffered the cars as they rolled in. It was after this second stop by way of the independent braking system, defendant theorized, that the slack ran in while plaintiff was in the process of crossing over between the two cars.

If the jury had believed this scenario rather than engineer Kiser's testimony that because a defect in the dynamic brake required him to utilize the automatic braking system resulting in the slack running in after the train had stopped, plaintiff would not have been able to prove defect or causation and the jury verdict would have been in favor of the defendant. In addition, if the jury had believed Mr. Couch's testimony that there was no defect in the dynamic brakes, as maintained by engineer Kiser, causation would not have been proven. We note that ordinarily the issue of proximate cause of an injury is one of fact for the jury to determine. (*Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 395, 356 N.E.2d 93, 100.) In the above causation analysis, plaintiff's action in crossing over between the two cars would have been an intervening independent

act rather than a concurrent act and therefore would have been the *sole cause* of his injury. (See *Page v. St. Louis Southwestern Ry. Co.* (5th Cir. 1965), 349 F.2d 820, 827 ("a jury, honestly determining that the injured employee's actions were the sole cause of injury, necessarily finds (either on a general charge or by special interrogatories) that no act of the railroad, even though found to be negligent, played any part in bringing about the injury").) We must conclude from the above discussion that the motion to strike the affirmative defense was proper and that the court in the instant case committed no error in granting this motion and in entering the *in limine* order barring further testimony on this issue.

Defendant next argues that when the court reversed its position on the issue of sole proximate cause when it decided to strike the defense, the court should have granted a mistrial to cure the prejudice done to defendant by the court's own indecision. Defendant contends that the jury was given no guidance following the court's order striking its affirmative defense and barring further evidence thereon and accordingly its position was prejudiced. It is well settled that a decision whether or not to grant a mistrial rests within the sound discretion of the trial court based upon the particular circumstances of the case. (*Benuska v. Dahl* (1980), 87 Ill. App. 3d 911, 913, 410 N.E.2d 249, 251.) A mistrial should be declared only as the result of some occurrence of such character and magnitude that a party is deprived of its right to a fair trial, and the moving party must demonstrate actual prejudice as a result of the ruling or occurrence. (*Benuska*, 87 Ill. App. 3d at 913, 410 N.E.2d at 251.) The trial court's ruling on a motion for mistrial will not be disturbed upon appellate review absent a clear abuse of discretion. *Benuska*, 87 Ill. App. 3d at 913, 410 N.E.2d at 251.

■ The court allowed defendant in opening statement to propose that plaintiff's own conduct would be a key issue in the case. Defendant admits that the court had warned defendant that it was at risk in discussing the defense in opening statement after refusing to grant plaintiff's pretrial motion *in limine* with respect to that affirmative defense. The court further disagreed with defendant, in ruling on defendant's motion for a mistrial, that it had made inconsistent rulings in the pretrial motion *in limine* and the motion to strike the affirmative defense made during plaintiff's case in chief. The court below pointed out that when it denied the pretrial motion, it carefully delineated the issue as turning on whether or not plaintiff was able to establish in his proof at trial a violation of the Act and that the violation was the cause in whole or in part of

plaintiff's injury. We must agree that the court correctly delineated the issue and that it fully explained its ruling to the parties and was applying the basis for its original ruling to the status of the proof at the time the motion to strike and motion *in limine* were made during plaintiff's case in chief. In our opinion, the court could not have been more consistent or instructive in its rulings.

As noted above, defendant was not prohibited from introducing evidence disputing the defect in the dynamic brakes and the resulting causation of plaintiff's accident, which directly impacted on the jury's assessment of proximate cause in its deliberation. Moreover, the evidence defendant sought to introduce, as per the offer of proof, did not impact on the issue of whether defendant's alleged violation of the Boiler Inspection Act was a proximate cause of plaintiff's injury by disputing the defect in the dynamic braking system or whether the defect was not the instrumentality through which plaintiff was injured. Instead, defendant sought to introduce evidence that plaintiff violated a known railroad rule in stepping on the drawbar or that he had admitted to railroad personnel after the accident that the accident had been "his fault," evidence which impacted on the issue of contributory negligence, an irrelevant and fatally prejudicial issue in a Boiler Inspection Act case. As the court pointed out to defendant when ruling on the motion to strike, it still had the right to argue whether there was a defect and whether there was causation, with or without the presence of the sole-cause defense. Indeed, the court below noted that the instructions as they pertain to the plaintiff's case are sufficient to give defendant argument in the sole-proximate-cause area, without being instructed thereon. We fail to see, therefore, how defendant was prejudiced in any way from being precluded from introducing the evidence presented in the offer of proof and hold that there was no abuse of the court's discretion in denying the motion for mistrial in the instant case.

Based on our holdings above that there was no error in the court's order striking the affirmative defense of sole proximate cause or in the *in limine* order barring further evidence on this issue and no abuse of discretion in denying defendant's motion for a mistrial, we affirm the February 22, 1990, judgment of the circuit court of St. Clair County.

Affirmed.

LEWIS and HOWERTON, JJ., concur.