LAURA LEWIS, Plaintiff-Appellee, v. RICHARD STOVAL, Defendant-Appellant.

Third District No. 3—94—0741

Opinion filed April 27, 1995.

Pamela Davis Gorcowski and Robert J. Baron, both of Rooks, Pitts & Poust, of Joliet, for appellant.

Robert B. Phillips IV, of Law Offices of Robert B. Phillips IV, and Bryan J. O'Connor, of Baal & O'Connor, both of Chicago, for appellee.

PRESIDING JUSTICE STOUDER delivered the opinion of the court:

The plaintiff-appellee, Laura Lewis, brought an action against the defendant-appellant, Dr. Richard Stoval, alleging negligence in the failure to diagnose and treat an infection which developed following total knee replacement surgery. The jury found for the plaintiff, and a judgment was subsequently entered in the amount of $268,135. The defendant appeals contending the trial court erred in admitting into evidence two medical treatises. Finding the error to be harmless because there was sufficient evidence to support the verdict and the defendant suffered no prejudice, we affirm.

On July 26, 1979, the plaintiff underwent surgery to replace her right knee joint with a prosthesis. The defendant performed the surgery. The record shows that for 12 days following the surgery the

plaintiff experienced drainage from the wound. On August 1, 1979, a culture was taken of the fluid draining from the wound. The record shows that five days later this culture showed the presence of *Staphylococcus epidermidis* (hereinafter referred to as *Staph epi*), a bacteria. Cultures taken on August 6 and August 7, 1979, also showed the presence of *Staph epi*.

On August 7, 1979, the defendant performed a second surgery to remove a hematoma from the subcutaneous tissue of the plaintiff's knee. During this surgery, the defendant did not enter the knee joint or capsule itself. The plaintiff was released from the hospital on August 18, 1979. Thereafter, the plaintiff was treated with physical therapy and examined by the defendant on a periodic basis.

When movement in the knee did not satisfactorily progress, the plaintiff was readmitted to the hospital in late September 1979 to undergo a manipulation procedure. After this procedure, the plaintiff was again prescribed physical therapy. The defendant next examined the plaintiff on October 31, 1979. At that time he aspirated the knee. According to the defendant's records, the report of the culture was negative for infection. On November 5, 1979, the defendant examined the knee. His records indicate he found no observable signs of infection and stated the knee appeared "benign."

Three days later, on November 8, 1979, the plaintiff went to see Dr. Alain Menguy at the Carle Foundation Hospital in Champaign-Urbana. Subsequent tests revealed a *Staph epi* infection within the knee joint. In January 1980, Dr. Menguy removed the prosthesis and fused the plaintiff's leg at the knee joint. The result of this procedure was the shortening of plaintiff's right leg by four inches and the inability to bend her leg at the knee. The record shows that in 1987 the plaintiff underwent surgery which successfully replaced her knee joint with a second prosthesis.

The first trial of plaintiff's action ended in a mistrial when the jury was unable to reach a verdict. Prior to the commencement of the second trial, the defendant moved to bar the admission of two medical treatises. One of the articles was co-authored by plaintiff's expert, Dr. David Schurman, in 1980. Schurman was an orthopedic surgeon from Stanford University. The second article was a 1977 article which was mentioned in a footnote in the Schurman article. The defendant argued the articles could not be used as substantive evidence, but only for purposes of impeachment. The plaintiff contended the articles were key to her case because they showed the state of knowledge concerning *Staph epi* in 1979.

This was viewed as important because the record indicates that in the first trial, one of the defense theories was that *Staph epi* was

not viewed as an infectious agent (pathogen) in 1979. In the second trial, the plaintiff was anticipating this defense and thus wished to present evidence to show that it was generally known in 1979 that *Staph epi* could cause infection. The court ruled that Schurman could read from his 1980 article to show this was his opinion.

At trial, Schurman testified that in 1979 *Staph epi* was viewed as a pathogen in the setting of artificial joint replacements. After so testifying, Schurman was asked to identify a copy of his 1980 article entitled "Cephalothin and Cefamandole Penetration into Bone, Synovial Fluid, and Wound Drainage Fluid." The article concerned the rate of penetration of two antibiotics into various body tissues when administered prophylactically prior to surgery in joint and hip replacements. Schurman read a sentence from the article to the jury. The sentence read, "*Staphylococcus aureus* and *Staphylococcus epidermidis* account for the majority of the infections after total joint replacement and therefore are worthy of special attention." In addition to the article itself, the plaintiff offered an exhibit which consisted of an enlarged reproduction of the page of the article on which the above sentence appeared. The defendant objected, asserting the article was hearsay. The trial court admitted the article and the enlargement into evidence.

Schurman was next asked about a 1977 article from the *Journal of Bone and Joint Surgery* entitled "The Penetration Characteristics of Cefazolin, Cephalothin and Cephradine into Bone in Patients undergoing [sic] Total Hip Replacement" co-authored by a number of doctors, including Dr. Burke A. Cunha. The Cunha article was mentioned in a footnote in Schurman's 1980 article. The article was cited to refer the reader to studies involving the concentration of cephalothin in bone.

Over defense objection, Schurman was allowed to read the following two sentences from the Cunha article to the jury: "Prophylaxis is usually directed against *Staphylococcus aureus* and *Staphylococcus epidermidis*, the organisms implicated in more than 90 per cent of the infections following implant surgery." And, "Cephalosporins are commonly used to prevent infection after total joint replacement since they have a high degree of activity against the usual pathogenic organism encountered in this setting, namely *Staphylococcus aureus* and *Staphylococcus epidermidis*." An enlarged reproduction of at least one of these sentences, plus the Cunha article, was admitted into evidence over defense objection.

References to these articles were made during the plaintiff's closing argument. In addition, the trial court allowed the articles to go to the jury during their deliberations.

The admissibility of evidence rests within the sound discretion of the trial court. (*Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.* (1991), 217 Ill. App. 3d 94, 576 N.E.2d 918.) In Illinois, scientific and medical treatises are hearsay and are inadmissible as proof of the statements contained therein. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279; *In re Estate of Dickens* (1987), 161 Ill. App. 3d 565, 515 N.E.2d 208.) Our supreme court has, at this point, declined to adopt Federal Rule of Evidence 803(18) (Fed. R. Evid. 803(18)), which provides that learned treatises are not excluded by the hearsay rule under certain specified conditions. See *Roach v. Springfield Clinic* (1993), 157 Ill. 2d 29, 623 N.E.2d 246.

The articles were submitted during the plaintiff's case in chief. Dr. Schurman not only read verbatim from the articles, but pages from the articles were enlarged, admitted into evidence and shown to the jury. The articles themselves were admitted into evidence and allowed to go to the jury during their deliberations. The articles were not offered chiefly for purposes of cross-examination nor as rebuttal to any defense raised by the defendant. The plaintiff admits in her brief before this court that the purpose of introducing the articles was to counter the anticipated contention which the defendant raised at the first trial, that *Staph epi* was not a known pathogen in joint replacement surgeries in 1979. Thus, it is clear the statements read to the jury by Dr. Schurman were being offered as substantive evidence and to bolster his testimony. To allow this was error.

The plaintiff argues the articles were admitted for the limited purpose of showing the materials which Schurman relied on in rendering his opinion. The plaintiff contends *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485, is controlling in this case. First, the record does not reflect the articles were principally offered for this alleged limited purpose. They were offered as evidence to show the state of knowledge concerning *Staph epi* at the time of the plaintiff's surgery.

Second, *Anderson* is readily distinguishable in that the documents in *Anderson* were reports and evaluations made by psychiatrists, doctors and counselor of a criminal defendant's mental health. They directly concerned the defendant's sanity— an issue in the case—and logically served as a basis for the testifying expert's opinion on the issue of sanity. The supreme court held that it was important to reveal to the trier of fact those facts on which the expert relied in reaching an opinion. This would better enable the trier of fact to evaluate the expert's testimony. The *Anderson* court was not saying such materials were not hearsay. They were admissible for the limited purpose of explaining the basis for the expert's opinion and the jury should be so instructed.

In the instant case there was no such limiting instruction. In addition, the articles did not relate directly to the treatment of the plaintiff in this case. They reported the results of studies on the rapidity with which certain antibiotics penetrate different human tissues. The articles concerned the use of antibiotics pre-operatively or prophylactically to prevent infections in joint and hip replacements. The record shows that, in this case, the defendant administered antibiotics at the time of the initial surgery and again at the time he removed the hematoma on August 7, 1979. Thus, the defendant's use of prophylactic antibiotics was not at issue.

Though we find error, this does not end our analysis. Where evidence is erroneously admitted, reversal is required unless the record affirmatively shows that the error was not prejudicial. (*Bong Jin Kim v. Nazarian* (1991), 216 Ill. App. 3d 818, 576 N.E.2d 427.) The admission of improper evidence is harmless where there is other evidence to support the verdict. *Raines v. New York Central R.R. Co.* (1972), 51 Ill. 2d 428, 283 N.E.2d 230.

In this case, Dr. Schurman testified that in his opinion the defendant's treatment of the plaintiff fell below the standard of care, in that the defendant failed to diagnose and treat a resolvable situation resulting in a serious infection and loss of the joint replacement. Schurman was of the opinion that the infection travelled from the subcutaneous tissue into the knee capsule. He believed that had the defendant diagnosed an infection in August 1979, and administered antibiotics, there was an overriding probability the infection would have been stopped.

Another plaintiff's expert, Dr. Scott Kale, opined that given the abundant evidence of infection, failure to diagnose the infection fell below the standard of care. In addition, when the question of possible infection was raised at the time of plaintiff's readmission to the hospital for the manipulation procedure in late September 1979, the defendant apparently took no steps to rule out infection.

Dr. Alain Menguy testified that when he examined the plaintiff's knee on November 8, 1979, the knee was warm to the touch, red and appeared swollen. He testified the knee did not look "benign" and that he immediately suspected an infected total knee replacement. Only three days before, on November 5, 1979, the defendant had examined the knee and found no sign of infection, indicating the knee appeared benign.

On the other hand, the defendant presented expert opinion that the signs and symptoms of infection were not present in August and September of 1979. These experts, Drs. Jack Casini and Grant Westenfelder, opined the defendant followed an appropriate course of treatment under the circumstances.

While the expert opinions were conflicting, we find the erroneously admitted evidence did not prejudice the defendant in that the evidence was irrelevant to the issues in the case. The defense was premised on two basic themes: (1) that the *Staph epi* bacteria contaminated the joint replacement within the knee capsule at the time of the initial surgery, and that no matter what treatment was administered the outcome would have been the same, *i.e.*, loss of the replacement, and (2) that signs and symptoms of infection were not sufficiently present to warrant use of antibiotics and risk the chance of creating an organism resistant to antibiotics.

The sentences read to the jury and highlighted in the enlarged exhibits were directed toward the infectious nature of the *Staph epi* bacteria. The plaintiff offered this evidence in the mistaken belief that the defense would argue that in 1979 it was not known or agreed within the medical community that *Staph epi* was a pathogen. The defendant in the present trial raised no such defense. Therefore, the erroneously admitted evidence was not directed toward a disputed issue in this case. Second, after reviewing the record we find there was other evidence sufficient to support the jury's verdict for the plaintiff. Thus, the erroneous admission of the medical treatises was harmless error in the instant case.

For the foregoing reasons, the judgment of the circuit court of Will County is affirmed.

Affirmed.

McCUSKEY and LYTTON, JJ., concur.