No. 3–09–0512

Filed May 24, 2010-Modified Opinion Filed on June 29, 2010

IN THE

APPELLATE COURT OF ILLINOIS

THIRD JUDICIAL DISTRICT

A.D., 2010

| | | |
|---|---|---|
| MORGAN JACKSON, a Minor, by Her Parents, | ) | Appeal from the Circuit Court |
| Ken Jackson and Jody Jackson, and | ) | of the 10th Judicial Circuit |
| KEN JACKSON and JODY JACKSON, | ) | Peoria County, Illinois, |
| Individually, | ) | |
| | ) | |
| Plaintiffs–Appellants, | ) | No. 06–L–95 |
| | ) | |
| v. | ) | |
| | ) | |
| CHURPHENA REID, and | ) | Honorable |
| AFFILIATED UROLOGY SPECIALISTS, LTD., | ) | Stephen Kouri, |
| | ) | Judge Presiding. |
| Defendants–Appellees. | ) | |

MODIFIED UPON DENIAL OF REHEARING

JUSTICE WRIGHT delivered the opinion of the court:

On December 6, 2004, plaintiffs, both individually and on behalf of their minor child, brought a medical malpractice action against defendants. A jury returned a verdict in favor of defendants on January 16, 2009. On appeal, plaintiffs claim that the trial court incorrectly denied their motion for mistrial. Further, plaintiffs assert the trial court erred as to certain evidentiary matters during trial.

FACTS

On December 6, 2004, plaintiffs filed a two-count complaint against defendants

Churphena Reid (Reid) and Affiliated Urology Specialists, Ltd. (Affiliated). The complaint alleged that Morgan Jackson (Morgan) was born to Ken and Jody Jackson on June 24, 1999. The complaint further alleged that Reid, a licensed physician, provided care and treatment to Morgan from November 1999 to August 2003. On June 30, 2003, Reid performed a surgical procedure known as bilateral ureteral implantation on Morgan, followed by an additional surgery on July 2, 2003. During this time period, Reid acted as an agent or employee of Affiliated.

Plaintiffs alleged that Reid was negligent by (1) performing the procedure "without specific indications for the surgery"; (2) improperly managing the procedure; (3) failing to leave a urinary drain postoperatively; (4) deviating from the standard of care; (5) failing to diagnose a "massive urinary extravasation"; (6) utilizing improper treatments; and (7) failing to consult with an intensivist, nephrologist or pulmonologist as to an opinion of Morgan's postoperative course.

Plaintiffs Ken and Jody Jackson brought count I of the complaint on behalf of Morgan and sought an amount in excess of $50,000 jointly and severally from Reid and Affiliated. Count II of the complaint was brought by Ken and Jody Jackson, individually, claiming, that as parents of Morgan, they are obligated to pay past and future medical expenses for treatment provided to Morgan resulting in a financial loss proximately caused by the negligence of Reid and Affiliated. Ken and Jody Jackson sought an amount in excess of $50,000 against Reid and Affiliated, jointly and severally.

Plaintiffs' Pretrial Requests

On January 2, 2009, plaintiffs filed three separate pretrial requests. First, plaintiffs filed a Supreme Court Rule 237(b) (210 Ill. 2d R. 237(b)) request for defendants to produce:

"All medical articles, articles, journals, treatises, texts, or other materials (including, but not limited to, those reviewed by Churphena Reid prior to her deposition which Plaintiff requested, and Defendants refused to produce) considered authoritative by defendant at the time of the occurrence, or since, regarding the care and treatment given by Defendant to Morgan Jackson."

Additionally on January 2, 2009, plaintiffs filed a motion *in limine.* Paragraph one sought an order barring defendants from communicating or implying that plaintiffs had or will receive insurance benefits for losses. Paragraph 3 sought an order barring testimony that someone other than Reid made the medical determination that the surgery was necessary. Paragraph 6 sought an order barring testimony that Morgan's postsurgery bed-wetting was caused by her parents' divorce. Paragraph 10 sought an order barring "[a]ny information regarding insurance, including that Ken and Jody Jackson had insurance at the time of Morgan's surgery, or that Churphena Reid scheduled Morgan's surgery on June 30, 2003, because Ken and Jody Jackson were changing insurance coverage on July 1, 2003."

Also on January 2, 2009, plaintiffs filed a motion to bar the testimony of Lori Klaus. According to the motion, defendants disclosed Lori Klaus as a lay witness who would testify regarding notes in the medical records regarding "personal conversations and phone conferences with Jody Jackson and/or Ken Jackson." One attached exhibit was a copy of telephone messages that indicated Jody Jackson called Reid on May 22, 2003, and asked if the August 2003 tests and office visit could take place on an earlier date because the family's insurance was changing. At the end of the note, it indicated "OK'd by CAR." Another exhibit included a telephone message

saying that Jody Jackson called Affiliated on May 27, 2003, in order to speak to Reid and wanted to know if "CAR can schedule surgery before end of June, so CAR will be covered in network." Another exhibit consisted of an office entry dated May 28, 2003, stating that "per CAR schedule renal/bladder sono [*sic*] PPV same day as UCUG & pencil in for surgery in June for right ureteral reimplantation." According to other exhibits attached to the motion, LK called Jody Jackson on June 17, 2003, and verified surgery for June 30, 2003.

On January 2, 2009, defendants filed a response to plaintiffs' motion *in limine* that objected to paragraphs 3, 6, and 10 of plaintiffs' motion. On the same date, defendants filed a written response objecting to the motion to bar Klaus's testimony. On January 8, 2009, the trial court addressed plaintiffs' motion *in limine*.

The trial court heard arguments relating to paragraph 6 of the motion in *limine,* which requested that the trial court bar evidence that Morgan's postsurgery bed-wetting was caused by her parents' divorce. Plaintiffs' counsel argued that there was not any testimony or evidence that Morgan's bed-wetting was caused by family trauma and that defendants were setting out a general proposition "without anything to back it up." Further, according to counsel, the bed-wetting began immediately following the surgery in 2003, and Morgan's parents did not divorce until 2005. Plaintiffs' counsel believed that there was a foundational timing issue, and therefore, the questioning was irrelevant. The trial court ruled that if plaintiffs' expert testified during direct examination that the surgery was the only cause of Morgan's bed-wetting, then defense counsel could "probe into what possible other causes there could be."

The parties agreed that paragraphs 3 and 10 of plaintiff's motion *in limine* and the separate motion to bar Klaus's testimony involved interrelated issues. The first issue was

4

whether someone other than Reid determined surgery was medically necessary. Another related issue was whether changes in plaintiffs' insurance coverage should be revealed to the jury. The court barred Klaus's testimony, but indicated he would revisit the issue if necessary at trial.

On January 12, 2009, the trial court entered a written order allowing paragraph 1 of plaintiffs' January 2, 2009, motion *in limine* and denying the motion as to paragraphs 3 (someone other than Reid decided the need for surgery) and 6 (bed-wetting). Also according to the order, the trial court granted paragraph 10 over defendants' objection. The court wrote:

> "The Court's granting of Paragraph 10 of Plaintiffs' Motion in
> Limine is subject to the same provisions as is its ruling on the
> Motion to Bar Klaus, stated below. *** With respect to Plaintiffs'
> Motion to Bar Klaus, Plaintiffs' Motion is denied on the grounds
> that Defendants' Rule 213 Disclosure was inadequate. Plaintiffs'
> Motion is granted on the grounds of relevancy. The Court will
> revisit this ruling upon Motion of Defendants if the evidence
> demonstrates that Klaus's testimony has become relevant."

Defendant's Motion *In Limine*

On December 29, 2008, defendants filed a motion *in limine* seeking numerous remedies from the court. Paragraph 17 of defendants' motion is the only portion of that motion which is relevant to the issues presented on appeal. In paragraph 17, defendants sought an order barring plaintiffs from questioning Reid regarding medical research she conducted or later discussed with her attorney. On January 5, 2009, plaintiffs filed a response to defendants' motion *in limine* and a motion to strike.

5

At the January 8, 2009, hearing, defense counsel stated to the court that paragraph 17 of his motion *in limine* related to a discovery dispute that arose in Reid's deposition 18 months ago on June 19, 2007. Plaintiffs' counsel advised the court that during Reid's deposition, defense counsel refused "to turn over the documents which were at the deposition, and he [defense counsel] instructed his client not to answer a question I asked about those articles." The record reveals that prior to the deposition, plaintiffs' counsel sent a request for Reid to produce "[c]opies of articles, texts, or other documents which Defendant, Dr. Reid, has reviewed in preparation for the deposition or in connection with the treatment of, and claim by, Morgan Jackson." The record also shows that at the end of the deposition, plaintiffs' counsel stated she would "wait for a ruling on various issues that couldn't be resolved in terms of the production of the articles and the instructions to the witness not to answer the questions."

On January 9, 2009, the trial court found that plaintiffs' counsel should be able to cross-examine Reid regarding whether she reviewed any articles that were contrary to her opinion. Further, the trial court ordered that Reid produce those articles still in her possession. Plaintiffs' counsel then stated that she wanted to inquire as to whether Reid destroyed any of her research or refused to produce documents. The trial court responded that it had concerns with those questions in light of the fact that plaintiffs' counsel allowed 18 months to pass without taking any action to correct the discovery situation which became apparent during Reid's deposition on June 19, 2007, and therefore, the trial court would not allow plaintiffs' counsel to question Reid about all documents she researched but did not provide to plaintiffs' counsel as requested in discovery.

The trial court advised plaintiffs' counsel that she could not inquire as to whether Reid gave the articles to her attorney. Additionally, the trial court barred plaintiffs from stating, or

6

implying or questioning witnesses in a manner that would imply Reid or her counsel concealed, hid or prevented disclosure of these articles.

Reid's Opinion Testimony

At the January 12, 2009, hearing, the day before trial, plaintiffs' counsel stated to the court that in light of the court's rulings on defendants' motion *in limine*, she filed a written motion to bar opinion testimony from Reid. Counsel stated that it was her position that Reid deliberately destroyed pertinent records. The following morning prior to jury selection, the trial court stated that it would allow Reid to provide opinion testimony. The trial court reasoned:

> "I just think this is a lot more – significantly more complicated
>
> because she's a party/expert, and it brings it – I don't think it's as
>
> simple as when she takes on the label of an expert, she loses all
>
> other labels and all other privileges. And there's some case law
>
> out there that isn't – you know, isn't our situation; i.e., a
>
> party/expert, and that's what I've been looking for, and apparently
>
> there's nothing out there that any of us can uncover. *** I do think
>
> that this implicates not just the work product privilege, but
>
> attorney/client privilege. And I think it's – maybe I'm looking at it
>
> wrong, but it just strikes me that if – if – particularly in the area of
>
> medical malpractice and the defendant is a doctor, that the
>
> defendant cannot do some of this legal research without it all being
>
> – not legal research, medical research, without all of it being
>
> discoverable, or else she has to at least sacrifice her ability to give

7

an expert opinion. I just think we start to unnecessarily infringe upon not just the attorney/client privilege, but the attorney/client relationship, which is broader than just communication between the parties. She has a right to defend herself, and I just think it unnecessarily intrudes upon that."

Jury Trial Opening Statements

In opening statements, plaintiffs' counsel told the jury that Morgan Jackson was a four-year-old girl that had "a surgery that never should have been performed." Plaintiffs' counsel discussed the complications experienced by Morgan as a result of the surgery, including a hole or perforation in her bladder and two additional surgeries. Plaintiffs' counsel also claimed that as a result of this "ordeal," Morgan continues to wet her bed almost every night, despite the fact that she was nine years old.

Defense counsel's opening remarks informed the jury that it would decide whether Reid committed malpractice and caused injury to a child. Defense counsel highlighted the history between Reid, Morgan's parents, and Morgan beginning in 1999. Reid did not want to do surgery until Morgan was approximately five years old. According to counsel, Reid established a plan in 1999 which included stool management, antibiotics and yearly monitoring to determine the status of Morgan's kidneys and the reflux. Reid planned to see Morgan during August 2003.

Defense counsel then said, "Now, the next thing that happened wasn't in August of 2003. It was in May. One of the parents called and said they want to move the –." At that point, plaintiffs' counsel interrupted and objected.

In a side bar, plaintiffs' counsel asserted that defense counsel's opening remarks violated

8

the court's ruling on plaintiffs' motion *in limine*. Defense counsel said that he did not mention insurance. The trial court inquired, and defense counsel said that he was going to state that the parents "called and moved the appointments up." The trial court then asked, "Why is it shown that they moved the appointment, why do you think?" Defense counsel responded that the parents wanted to discuss surgery. The trial court instructed defense counsel that the court did not "want a reference made to they moved the appointment up. They went in. They had an appointment. That's it."

Then, defense counsel continued with his opening statement before the jury by saying "[i]n May, they [Morgan's parents] went in for an appointment. They had discussed surgery in the prior year. It was discussed again." According to counsel, Reid told Morgan's parents that Morgan's reflux was persistent, that surgery was a reasonable alternative at that point, and that she recommended surgery. Defense counsel concluded by saying that a breach of the standard of care did not occur in this case.

Jury Trial Testimony

Peggy Marshall

Plaintiffs' counsel called Peggy Marshall (Peggy) to testify. Peggy explained that she had been a registered nurse since 1999 and that she worked on the pediatric floor at Methodist hospital from 1999 until 2004. While at Methodist hospital, she provided care to Morgan Jackson following bilateral ureteral reimplantation surgery performed by Dr. Reid on June 30, 2003. She cared for the child immediately after this surgery until her discharge on July 7, 2003.

By the late afternoon on July 2, 2003, Peggy observed Morgan "turning blue." She also observed Morgan's stomach turning purplish with a lacy appearance. At 5:30 p.m., Morgan was

9

sent to the X-ray department for a sonogram. Peggy testified that the sonogram revealed free fluid in the peritoneal cavity, the abdominal region. Morgan returned from the X-ray department at 6:45 p.m., and Reid ordered that Morgan be returned to surgery that evening. Peggy also testified that during her care of Morgan, she became frustrated with Reid because she paged Reid for particular problems, but did not get a response in an appropriate time frame. As a result, Peggy had to repage Reid in order to get a response.

Following the second surgery on July 2, 2003, Peggy explained Morgan still experienced difficulty breathing and her abdomen remained swollen on July 3, 2003. During the night of July 2, 2003, until the morning of July 3, 2003, Peggy stated that Morgan's respiration and heart rate were monitored. During this time, the alarm on the monitor activated several times due to Morgan's low heart rate. At 8:50 a.m., Reid called to check on Morgan, and the nurses advised her of the alarm on the monitor. Reid told the nurses that there was "nothing to be concerned about."

On July 7, 2003, the records indicated that Morgan experienced lower abdominal pain with spasms causing urinary incontinence. Peggy explained that urinary incontinence means that "urine comes out *** it happens, and it's not meant to be." On that day, Morgan was discharged from the hospital with instructions, including home health care by a nurse.

Kimberly Marshall

Kimberly Marshall (Kimberly) testified next for the plaintiffs. Kimberly explained that she practiced medicine since 1995 with Sugar Creek Medical Associates, specializing in pediatrics. As a physician with Sugar Creek Medical Associates, Kimberly provided care to Morgan, beginning shortly after her birth. At six weeks of age, Morgan was admitted to the

10

hospital for fever and kidney infection. As a result of the hospitalization, another physician determined that Morgan had "Grade 2 reflux on the left and Grade 3 on the right." After receiving these results, Kimberly referred Morgan to Reid, a pediatric urologist.

Following the surgeries by Dr. Reid, Kimberly saw Morgan again as a patient. At that time, at the request of Morgan's parents, she referred the family to a different urologist, Dr. Coplen of the St. Louis Children's Hospital. Kimberly also referred Morgan to a pediatric gastroenterologist because Morgan was experiencing constipation and urinary retention.

### Dr. Churphena Reid

Plaintiffs then called Reid to testify as an adverse witness. Reid testified that she worked as a pediatric urologist. She first saw Morgan as a patient in early fall 1999. When Reid saw Morgan in 2001, she was doing well and had not suffered from any urinary infections. At that time, reflux was observed on the right side at grade 3, but not the left side. In the notes, she wrote: "If it still shows persistence of Grade 3 reflux on the right, we will then start discussing whether or not to proceed with surgical correction." At this time, Morgan was two years old.

In 2002, the tests showed Morgan still did not have any sign of reflux on the left. Reid said that according to the records, Morgan had grade 2 to 3 reflux on the right. Later in 2002, Reid wrote that if Morgan still had persistent reflux of unchanged severity in 2003, it would become unlikely that her reflux would resolve itself with time. Reid stated that her concerns in 2002 stemmed from an abnormal kidney test result. However, when the test was conducted again in the fall of 2002, it revealed that there were no issues with her kidney. Therefore, she continued Morgan on antibiotics.

Reid saw Morgan on June 12, 2003. At this time, Morgan was almost four years old. In

11

2003, Morgan's test results still showed no reflux on the left side. In the findings of the test report, it indicated a grade 2 reflux on the right side. However, Reid stated that the final impression of the report indicated a grade 3 reflux. Reid told Morgan's parents that after five years of age, the odds of the reflux improving reduced to 20% or less. Reid pointed out that she told the parents to start considering surgery. She did not tell them that the surgery was necessary. Further, she believed that Morgan's condition was beginning to reach a point where the reflux would not resolve itself. Her recommendation was "that if they [Morgan's parents] wish to consider it, it is acceptable." She provided the information so that the parents could make a decision regarding surgery.

Reid agreed that literature from the American Urological Association provides that reflux will gradually disappear and that the average age for the disappearance is five to six years. Reid also acknowledged that her office notes dated August 21, 2000, stated that she would "only consider fixing her [Morgan's] reflux if she fails to outgrow it after age five." However, Reid operated on Morgan six days after her fourth birthday. Reid agreed that operating on Morgan was inconsistent with her office notes of August 21, 2000.

Plaintiffs' counsel questioned Reid about the American Urological Associations's (AUA) recommendations to continue antibiotics until the reflux disappears or it lowers. Reid said that Morgan's reflux was not low. The following series of questions and answers occurred:

"Q. But, I'm talking about this decision to do the surgery,

Doctor Reid.

A. Okay.

Q. If you would have done what this book suggests is

12

usually done, antibiotics are usually continued until the reflux

disappears or the risk is considered low.

A. Okay. Yes, uh-huh.

Q. But that isn't what happened with Morgan; right? She

wasn't continued on the antibiotics. You went ahead and did the

surgery?

A. At parents' request, yes.

Q. Well, what's this business about the parents – did the

parents come into your office and say, 'We demand that you do

bilateral reimplantation on our child'?

A. They called and wanted the office visit moved up so

they can consider having the surgery done, yes, because remember,

she was already –."

At that point, plaintiffs' counsel objected, and the trial court removed the jury from the

courtroom.

Request for Mistrial

Outside the presence of the jury, plaintiffs' counsel said that this was the second time that

day that the defense violated the court's order *in limine*. Plaintiffs' counsel went on to say that

the trial court's pretrial ruling was clear and that the court further clarified the ruling earlier that

day during trial. Further, according to plaintiff's counsel, Reid's testimony indicated that the

parents called her in June and wanted the surgery done. Plaintiffs' counsel requested a mistrial.

The trial court disagreed with plaintiffs' counsel as to the interpretation of Reid's

13

testimony. However, the trial court observed that Reid's testimony was not "directly responsive" to the question asked by plaintiffs' counsel. The trial court said that he believed that plaintiffs had "a legitimate concern that somebody might draw what I [trial judge] consider, Miss Corwin, a weak inference that – you know, that the Plaintiffs are the ones pushing to have the surgery, a weak inference from the change in the appointment."

The trial court indicated its inclination was to instruct the jury that the timing of the appointment had no relevance on the issues of the case. The trial court said that "now all of a sudden you're [defense counsel] telling me it does." Defense counsel said that "[y]eah, it does, and I think we're maybe at a point where a mistrial is – I mean, we're so bent around this thing –." Defense counsel explained that the timing of the appointment was relevant because "if they [Morgan's parents] wanted to continue on with the plan, they could have had the antibiotic therapy in August. Everything would have stayed the same and then come back the next August and the next August. But they were fed up with it. I mean, that's an inference we can draw."

The trial court stated that he specifically instructed the defense not to mention insurance or that the parents called and moved the appointment "because I [trial court] thought it was even more harmful to the Plaintiff." The judge went on to say that he was not inclined to declare a mistrial, but would instruct the jury that "the fact that the appointment was in June rather than in August has no relevance to the issues in this case." Plaintiffs' counsel requested time to write the proposed instruction.

Plaintiffs' counsel asked the trial court to instruct the jury before they were dismissed for the day. Counsel argued that the trial stopped on her objection, and she did not want the jury spending the rest of the night wondering why she objected and what happened in the courtroom

outside their presence. The trial court said that he believed that they could break for the day and dismissed the jurors for the day without any instruction from the court.

On the following day, January 14, 2009, outside the presence of the jury, the trial court indicated to the attorneys that they needed "to take up then and close up the issue that was raised late last night, the request by the defendant to have a mistrial." Defense counsel corrected the judge and advised "[i]t was plaintiff." Then the trial court said, "I'm sorry, the plaintiff - but the defendant agreed I guess, or vaguely indicated that maybe that [a mistrial] should be the right course, not sure."

The trial judge indicated that he had prepared an instruction to be presented to the jury that morning. Plaintiffs' counsel stated that she believed an instruction would now draw additional attention to the discrepancies and that she stood upon her request for a mistrial as the only appropriate relief.

The trial court stated that he would not give the limiting instruction if plaintiffs' counsel believed that a mistrial was the only appropriate remedy. The judge then said that he would not grant a mistrial, would not give the instruction and the trial would simply move forward.

Reid's Testimony Resumes

In the presence of the jury, plaintiffs' counsel continued her questioning of Reid and showed Reid a copy of the transcript of defense counsel's opening statement. Reid acknowledged that her attorney told the jury that she recommended the surgery. However, Reid stated that her attorney "misspoke, because my records clearly said it's for consideration." Reid testified that she did not recommend the surgery. Reid testified that each year, she met with plaintiffs and discussed the possibility of surgery. Further, Reid said that she would not have

15

performed the surgery if she did not believe that it was medically appropriate.

Reid also testified that her records contained patient history regarding Morgan and that the information would have been provided by the parents. In one of the notes prepared before surgery, it indicated that Morgan had a recent episode of incontinence during a daytime nap and that "usually she's wet at night."

When questioning Reid, defense counsel referred to a table, later marked and admitted as defense exhibit 17. Plaintiffs' counsel said that she did not object. When Reid first saw Morgan, Morgan would have fallen into the first quadrant of the table which recommended antibiotic treatment. Later, Morgan would have fallen into the follow-up treatment category, which indicated surgery if the reflux remained persistent.

Plaintiffs' counsel questioned Reid about a subsequent article in 2002 that indicated the 1997 AUA guidelines were outdated and that other treatment options were available. Reid acknowledged the 2002 article. Then, she stated that the chart in defense exhibit 17 was part of the 2002 article listing a new treatment option of endoscopic surgery approved in 2001. However, according to Reid she did not have the equipment to perform the endoscopic surgery.

### Dr. Myles Gibbons

Dr. Myles Gibbons testified for plaintiffs as an expert witness. Gibbons said that Reid violated the standard of care within a reasonable degree of medical certainty on several points. Regarding the first surgery on June 30, 2003, he testified that he believed that the surgery was performed prematurely and without indication. Gibbons also testified that he believed Morgan's antibiotic treatment was "very well managed." The treatment plan indicated a benchmark age of five years. According to Gibbons, Reid violated that plan. Gibbons said that most children

16

outgrow reflux. Morgan's testing showed improvement. At that time, other treatment alternatives existed, but Reid failed to discuss those options with Morgan's parents.

Gibbons said that Morgan was a very, very critically ill girl following the surgery on June 30, 2003, and that if the situation "would have been allowed to go on untreated and untended to she would have died." Gibbons then testified that it was his opinion that the trauma of the three surgeries caused Morgan's voiding dysfunction.

Following the surgeries, Gibbons knew that Morgan's parents asked to be referred to a different urologist, Coplen. Gibbons said that he was familiar with Dr. Coplen. Then, plaintiffs' counsel attempted to admit into evidence records from Coplen's office. Defense counsel objected on the grounds that the documents were hearsay. The trial court sustained the objection.

Gibbons said that he was under the impression that the issue of bed-wetting was minimal before the surgery and increased after the operation. Defense counsel asked if Gibbons considered other alternative explanations for the bed-wetting, such as a divorce. When asked if he agreed that family stress can contribute to bed-wetting in small children, Gibbons said, "certainly not in all situations."

On redirect, he stated that it was not his opinion that Morgan's bed-wetting was caused by her parents' divorce. Further, he said that if Morgan began bed-wetting in 2003 following the surgery and her parents did not divorce until 2005, there would be no contemporaneous relationship between the two.

### Ken Jackson

On the next day, January 15, 2009, plaintiffs' counsel called Ken Jackson (Ken) to testify. Ken testified that he was Morgan's father and that he divorced Morgan's mother in August 2005.

In June 2003, he met with Reid.  Ken did not remember much of a discussion regarding surgery. Ken said "the tests were done, and we were pretty much told that she [Reid] felt that it [reflux] was still there, and that we would just go ahead and have the surgery done, and it would be taken care of now."  Reid made him feel comfortable because this "was her specialty."  Reid told them she performed the procedure many times, and it "would be a very quick process, and Morgan would be back to normal within the week."

On cross-examination, Ken stated that he relied upon Dr. Reid.  Ken further stated that in May 2003, he and his wife called Reid to meet and discuss Morgan's test as they did every year. He said that he did not want Morgan to have an operation and did not call Reid's office because he wanted to talk about having surgery done.

## Jody Jackson

Jody Jackson (Jody) testified that she was previously married to Ken Jackson and that Morgan was her daughter.  Jody said that Morgan wets the bed every night without exception. Jody explained that Morgan wears pull up diapers, that she equipped the bed with extra cloth for absorbency and washes the bedding a couple of times per week.  According to Jody, before the surgery, Morgan was potty trained and only occasionally wet the bed.  Jody said that since the surgery, there had not been any change in Morgan's bed-wetting, either before or after her divorce from Morgan's father.  On cross-examination, Jody stated that she recalled that Reid highly recommended surgery because there was very little chance that the reflux would resolve itself.

## Christopher Cooper

Christopher Cooper testified as the defense's expert witness.  Cooper testified that he

18

reviewed Methodist hospital records and records from Reid and Dr. Kimberly Marshall, along with deposition transcripts and formed an opinion within a reasonable degree of medical certainty that Reid met the standard of care when treating Morgan from 1999 until 2003. He explained that most children with reflux outgrow the condition, and therefore, a treatment plan involving antibiotics is typical. If the reflux does not resolve itself, then one must consider whether to perform surgery or continue treatment with the antibiotics.

Cooper said that the 1997 AUA guidelines were not out of date and contained good information which he still used. He further believed that Morgan was an appropriate candidate for surgery in June 2003. Since Morgan's condition did not improve on the right side, Cooper believed that by age four, it was very unlikely that the reflux would go away.

On cross-examination, plaintiffs' counsel asked Cooper if there was a standard of care as to when a bladder leak should be diagnosed. Cooper responded, "No, it's such a rare complication that there's no, 'This is how you handle this when this occurs.'" Further, he believed that there was not a standard of care regarding fluid management or whether a drain should be left in place following surgery.

### Dr. Churphena Reid

Defense counsel called Reid to testify on her own behalf. At the end of Reid's testimony, defendants rested. Plaintiffs did not offer any rebuttal evidence.

### Exhibits and Closing Arguments

Outside the presence of the jury, the trial court addressed the issue of exhibits with the attorneys. Defense counsel sought admission of defense exhibit 17 which counsel described as a table or compilation of the American Urological Association's guidelines. Plaintiffs' counsel

19

objected to exhibit 17 because the chart was part of a medical article, and medical articles are not admissible. Plaintiffs' counsel stated that the trial court ruled prior to trial that medical articles would not be admitted pursuant to defendant's motion *in limine*. The trial court said that it was admitting the chart, exhibit 17, and it would go to the jury during deliberations.

Following closing arguments and the jury's deliberations, the jury returned a verdict for defendants and against plaintiffs. On March 20, 2009, plaintiffs filed a posttrial motion claiming that due to errors which occurred during the trial, plaintiffs were entitled to a new trial. The trial court denied plaintiffs' posttrial motion for new trial on June 9, 2009. On June 12, 2009, plaintiffs filed a timely notice of appeal.

ANALYSIS

On appeal, plaintiffs raise five claims of error. First, plaintiffs argue that the trial court erroneously denied plaintiffs' motion for mistrial. Second, plaintiffs argue that the trial court committed error by refusing to allow plaintiffs' counsel to question Reid about medical articles which she reviewed and later destroyed. Alternatively, plaintiffs contend that the trial court should have granted their motion to bar Reid's opinion testimony. Third, plaintiffs argue that the trial court erred by admitting defense exhibit 17 into evidence and then allowing the jury to consider the exhibit during deliberations. Fourth, plaintiffs argue that the trial court erred by allowing defense counsel to question witnesses that Morgan's bed-wetting was caused by her parents' divorce. Finally, plaintiffs argue that the trial court improperly denied plaintiffs' request to admit Dr. Coplen's medical records into evidence.

Motion for Mistrial

Plaintiffs argue that the trial court should have granted the request for mistrial because

20

defendants violated the order *in limine* on two occasions during the first day of trial. Defendants respond that the trial court correctly denied plaintiffs' motion for mistrial.

"The decision to deny a motion for a mistrial is committed to the sound discretion of a circuit court." *Poulos v. Lutheran Social Services of Illinois, Inc.*, 312 Ill. App. 3d 731, 746 (2000) citing *Maple v. Gustafson,* 151 Ill. 2d 445, 455 (1992). " 'A mistrial should be declared only as the result of some occurrence of such character and magnitude that a party is deprived of its right to a fair trial, and the moving party must demonstrate actual prejudice as a result of the ruling or occurrence.' " *Poulos v. Lutheran Social Services of Illinois, Inc.*, 312 Ill. App. 3d at 746, quoting *Baker v. CSX Transportation, Inc.,* 221 Ill. App. 3d 121, 138 (1991). This court has previously ruled that in order for a "violation of an order *in limine* to be the basis of a new trial, the order must be specific and the violation clear. Where the likelihood of prejudice is great, the violation is reversible error." *Tomaszewski v. Godbole*, 174 Ill. App. 3d 629, 634 (1988), citing *In re Estate of Loesch*, 134 Ill. App. 3d 766 (1985).

We begin by examining the clarity of the trial court's order in this case to determine if the court abused its discretion when denying the motion for mistrial. Here, paragraph 10 of plaintiffs' motion *in limine* requested the exclusion of "[a]ny information regarding insurance, including that Ken and Jody Jackson had insurance at the time of Morgan's surgery, or that Churphena Reid scheduled Morgan's surgery on June 30, 2003, because Ken and Jody Jackson were changing insurance coverage on July 1, 2003." The trial court entered a written order granting paragraph 10 of plaintiffs' motion prior to trial. During opening statements at trial, the court had an opportunity to provide further clarification of the written order *in limine* based on the following circumstances.

21

When addressing the jury, during opening statements, defense counsel first told the jury that Reid did not want to do surgery until Morgan was approximately five years old and planned to see Morgan during August 2003. Defense counsel then said, "Now, the next thing that happened wasn't in August of 2003. It was in May. One of the parents called and said they want to move the - ." At that point, plaintiffs' counsel interrupted and objected.

In a side bar, defense counsel stated that he was going to say that the parents "called and moved the appointments up." The trial court then asked, "Why is it shown that they moved the appointment, why do you think?" Significantly, the trial court specifically instructed defense counsel that the court did not "want a reference made to they moved the appointment up. They went in. They had an appointment. That's it." In our view, the judge's verbal instruction to counsel provided abundantly clear and concise direction for defendant and defense counsel regarding the scope of the previous ruling on plaintiffs' motion *in limine*.

Later that same day, when plaintiffs called Reid to testify as an adverse witness, the following exchange occurred during the direct examination of Reid by plaintiffs' counsel:

Q. But that isn't what happened with Morgan; right? She wasn't continued on the antibiotics. You went ahead and did the surgery?

A. At parents' request, yes.

Q. Well, what's this business about the parents – did the parents come into your office and say, 'We demand that you do bilateral reimplantation on our child'?

A. They [Morgan's parents] called and wanted the office

22

visit moved up so they can consider having the surgery done, yes,

because remember, she was already –"

The trial court excused the jurors from the courtroom and plaintiffs requested a mistrial based on this testimony. The trial judge observed that plaintiffs had "a legitimate concern that somebody might draw what I [trial judge] consider, Miss Corwin, a weak inference that – you know, that the Plaintiffs are the ones pushing to have the surgery, a weak inference from the change in the appointment." Then the trial court recessed for the day. The next morning, plaintiffs' counsel argued that the jurors had "been contaminated with that to the point that the only option is a mistrial, and *** any other relief would be insufficient" due to the violations of the order *in limine* by the defense. The judge denied the request for a mistrial.

In this case, the jurors first heard defense counsel's opening statement which included a comment, interrupted by plaintiffs' objection, that "one of the parents called and said they want to move the –." At this point the trial court *specifically* instructed defense counsel that due to the order *in limine* the court did not "want a reference made to they moved the appointment up." In spite of this admonishment, Reid's non-responsive testimony created the prohibited inference that the parents wanted the appointment moved up so they could accelerate the time table for surgery.

When defense counsel addressed plaintiffs' request for mistrial, counsel admitted the defense attempted to show the parents wanted surgery because they were "fed up" with the situation that was unresolved by antibiotics. Defense counsel said:

"[I]f they [Morgan's parents] wanted to continue on with the plan, they could have had the antibiotic therapy in August. Everything would have stayed

23

the same and then come back the next August and the next August. But they were fed up with it. I mean, *that's an inference we can draw*." (Emphasis added.) The court found the "weak inference" created by Reid's testimony was a legitimate concern for plaintiffs.

We reject defendants' contention that plaintiffs have waived the issue of a mistrial because plaintiffs did not accept the trial court's offer to give a curative instruction to the jury. However, the fact that the court felt a curative instruction was warranted is significant. Plaintiffs sought a mistrial as the remedy for a violation of the order *in limine,* and this is the context for the trial court's exercise of discretion.

A pivotal issue in this case was the timing of the surgery and whether Morgan was an appropriate candidate for surgery just after her fourth birthday. Reid's testimony violated the court's clear verbal directive regarding the scope of the pretrial order *in limine* and resurrected the inference that Morgan's parents, rather than Reid, dictated when the surgery would occur. Reid injected an unfair inference into the trial which the court clearly directed the defense to avoid in order to insure a fair trial for plaintiffs. The character and nature of the violation of the *in limine* order which followed and then built upon the implication mentioned by defense counsel during opening statements, created a unique set of circumstances that ultimately denied plaintiffs a fair trial. See *Juarez v. Commonwealth Medical Associates*, 318 Ill. App. 3d 380 (1st Dist. 2000). Based upon the foregoing, we conclude that the court abused its discretion and should have allowed plaintiffs' motion for mistrial.

### Reid's Opinion Testimony

A brief review of the procedural history is in order. First, defendants disclosed Reid as an

24

expert witness pursuant to Supreme Court Rule 213(f)(3) (210 Ill. 2d R. 213(f)(3)). The disclosure provided that Reid would testify regarding "the standard of care and causation issues" and that "she met the standard of care."

Prior to Reid's discovery deposition on June 19, 2007, plaintiffs' counsel sent notice of the deposition. The deposition notice was accompanied by plaintiffs' request for Reid to produce "[c]opies of articles, texts, or other documents which Defendant, Dr. Reid, has reviewed in preparation for the deposition or in connection with the treatment of, and claim by, Morgan Jackson." During Reid's deposition, it became clear to plaintiffs' counsel that Reid conducted research prior to the deposition which she did not produce, as requested by plaintiffs, during the deposition. Subsequently, pursuant to Supreme Court Rule 237(b) (210 Ill. 2d R. 237(b)), plaintiffs requested defendants to produce:

> "All medical articles, articles, journals, treatises, texts, or other
>
> materials (including, but not limited to, those reviewed by
>
> Churphena Reid prior to her deposition which Plaintiff requested,
>
> and Defendants refused to produce) considered authoritative by
>
> defendant at the time of the occurrence, or since, regarding the care
>
> and treatment given by Defendant to Morgan Jackson."

Following plaintiffs' request for the production of Reid's research, the defense filed a motion *in limine* seeking to prevent plaintiffs from questioning Reid concerning the medical research she conducted and/or later discussed with her attorney. After the hearing on defendants' motion *in limine,* the trial court found Reid's research was subject to work product or attorney-client privilege because Reid was a named party.

25

The trial court decided that an expert witness, who is also a party to the litigation, possesses additional privileges not applicable to other experts. Consequently, the judge prohibited plaintiffs from stating or implying or questioning witnesses in a manner that would imply Reid or her counsel concealed, hid or prevented disclosure of these articles. Further, the court restricted plaintiffs' cross-examination of Reid to the issue of whether she reviewed any articles that were contrary to her opinion.

Plaintiffs' counsel stated to the court that, in light of the court's rulings on defendants' motion *in limine*, she was filing a written motion to bar opinion testimony from Reid. Plaintiffs' counsel stated that it was her position that Reid deliberately destroyed pertinent research records. The following morning, before jury selection, the trial court indicated that he would allow Reid's opinion testimony as an expert witness.

On appeal, plaintiffs assert that the court should have allowed plaintiffs' counsel to test the basis of Reid's opinion testimony by cross-examining her concerning the articles she reviewed in preparation for her deposition and then later destroyed, whether she relied on those articles or not. Alternatively, plaintiffs argue that the trial court erred by refusing to bar Reid's opinion testimony as a discovery action.

Supreme Court Rule 213 identifies three types of opinion witnesses as follows: lay witnesses under Rule 213(f)(1), independent expert witnesses under Rule 213(f)(2), and controlled expert witnesses under Rule 213(f)(3). 210 Ill. 2d Rs. 213(f)(1) through (f)(3). In this case, defendants identified Reid as a Rule 213(f)(3) witness. Within each category, the rule defines the nature of the information that the proponent of the expert witness must disclose to the opposing party before trial.

In this case, pursuant to Rule 213(f)(3) the defense was required to disclose the subject matter of Reid's testimony, her opinions and the foundation for that opinion along with her qualifications, and any reports Reid prepared about the case. 210 Ill. 2d R. 213(f)(3). The rule is significant because the rule provides that Reid's *direct* examination should be limited to those topics disclosed by the defense pursuant to Rule 213(f)(3). 210 Ill. 2d R. 213(g).

However, the scope of disclosure required by Rule 213(f)(3) does not limit or restrict the scope of *cross examination* for plaintiffs when testing Reid's opinion testimony. According to the committee comments, Supreme Court Rule 213(g) was intended to provide an opposing party with wide latitude during cross-examination. 210 Ill. 2d R. 213(g), Committee Comments. The wide latitude for cross-examination of an expert witness, addressed in the committee comments, is very consistent with longstanding and well accepted case law.

In *Wilson v. Clark*, 84 Ill. 2d 186 (1981), *cert. denied,* 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140 (1981), our supreme court adopted the Federal Rules of Evidence, which provide that an expert may base an opinion or inference upon facts or data made known to him at or before the hearing and that such facts or data need not be admissible in evidence. Relying on the *Wilson v. Clark* rule, the court in *Piano v. Davison*, 157 Ill. App. 3d 649 (1987), concluded that counsel "must be given the widest latitude during cross-examination to demonstrate any interest, bias, or motive of the expert witness to testify, and to test his accuracy, recollection and credibility." *Piano v. Davison*, 157 Ill. App. 3d at 671. Adopting the analysis in *Piano*, our supreme court later held that " 'the expert may be cross-examined with respect to material reviewed by the expert but upon which the expert does not rely.' " *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 105 (1995), citing 1 J. Strong, McCormick on Evidence §13, at 56-57

27

(4th ed. 1992). In *People v. Wagener*, 196 Ill. 2d 269 (2001), the court again stated that an expert may be cross-examined about materials reviewed by the expert even though not relied upon by the expert in forming his or her opinion. *People v. Wagener*, 196 Ill. 2d at 274.

We reject the notion that plaintiffs in this case should have been restricted in the scope of Reid's cross-examination by the work product rule or the principles of attorney-client privilege. The work product rule protects documents prepared *by counsel. Monier v. Chamberlain*, 35 Ill. 2d 351, 359-60 (1966). Here, the articles, which plaintiffs' counsel sought to discuss during cross-examination, were not prepared by defense counsel. Thus, work product rule does not apply.

Further, attorney-client privilege protects statements made by a client to counsel in confidence. *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 584 (2000). Nonetheless, a client may waive the privilege and disclose communications with counsel. *Lama v. Preskill*, 353 Ill. App. 3d 300, 305 (2004), citing *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.*, 189 Ill. 2d at 584. Here, once Reid elected to testify as an opinion witness, we conclude that her expert opinions previously shared with counsel prior to trial are no longer protected because the privilege has been waived, presumably in this case, with the approval of counsel.

Neither the case law nor Supreme Court Rule 213 provides authority for the proposition that the cross-examination of a controlled expert, who is also a party, should be less rigorous than cross-examination for any other expert. Consequently, we conclude that an expert witness, who is also a party, is subject to the same scope of rigorous cross-examination as any other Rule 213(f) witness. Here, the trial court's ruling on defendants' motion *in limine* denied plaintiffs the opportunity to test the reliability of Reid's opinions which were offered by the defense for the

jury's consideration.  As a result, plaintiffs were denied a fair trial.

## Evidentiary Rulings

Since we are remanding the matter for a new trial, and it is likely the same evidentiary issues may arise, we briefly address those issues in the interest of judicial economy.  The admissibility of evidence is within the sound discretion of the trial court.  *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d 887, 891 (1995).  Such evidentiary determinations will not be overturned on appeal unless there is clearly an abuse of discretion.  *Bosco v. Janowitz*, 388 Ill. App. 3d 450, 463 (2009).

## Defense Exhibit 17

Plaintiffs argue that the trial court erred by admitting a chart from a medical article marked as defense exhibit 17 into evidence.  Plaintiffs assert that the court compounded this error by sending the exhibit with the jurors into the jury room.  Defendants argue that the chart summarized the guidelines of the American Urological Association for treatment of patients with reflux, and therefore, was properly admitted by the trial court and sent to the jury room.

First, we address whether defense exhibit 17 was properly admitted into evidence.  A review of the record shows that defendant's exhibit 17 is one page from a medical article entitled "Vesicoureteral Reflux: A New Treatment Algorithm."  The article in question, which plaintiffs attached to their posttrial motion for new trial, states:

> "In 1997, the American Urological Association (AUA)
>
> published guidelines for the treatment of pediatric vesicoureteral
>
> reflux. *** Tables 1 and 2 [defense exhibit 17] summarize the
>
> recommendations for children without and with renal scarring,

29

respectively."

We agree with plaintiffs' contention that exhibit 17 is a summary chart of AUA guidelines, contained within a medical article, and does not represent guidelines or industry standards authorized and issued by the American Urological Association. The case law provides "in Illinois, scientific and medical treatises are hearsay and are inadmissible as proof of the statements contained therein." *Lewis v. Stoval*, 272 Ill. App. 3d 467, 470 (1995), citing *Walski v. Tiesenga*, 72 Ill. 2d 249 (1978). Thus we conclude, the exhibit was inadmissable.

Section 2-1107 of the Code of Civil Procedure reveals that documents read or received into evidence may be reviewed by the jury during their deliberations. 735 ILCS 5/2-1107(d) (West 2008). The "decision of whether to send exhibits to the jury room rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion." *Malanowski v. Jabamoni*, 332 Ill. App. 3d 8, 14 (2002), citing *Fultz v. Peart,* 144 Ill. App. 3d 364, 379 (1986). However, we have concluded that the exhibit should not have been admitted into evidence. Accordingly, the exhibit should not have been submitted to the jury for their consideration during deliberations.

Bed-wetting

Plaintiffs claim that the trial court erred by allowing defense counsel to question plaintiffs' expert about whether the divorce of Morgan's parents may have caused Morgan's bed-wetting. Plaintiffs claim that the evidence was irrelevant. The defense asserts that the trial court properly allowed defense counsel to elicit testimony regarding other possible causes of Morgan's bed-wetting.

It is well established that only relevant evidence is admissible. *Maffett v. Bliss*, 329 Ill.

30

App. 3d 562, 574 (2002). " 'Evidence is considered to be relevant when it has " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence' " '. " *Bergman v. Kelsey*, 375 Ill. App. 3d 612, 636 (2007), quoting *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 384 (2003), quoting *Smith v. Silver Cross Hospital,* 339 Ill. App. 3d 67, 73-74 (2003), quoting *Wojcik v. City of Chicago,* 299 Ill. App. 3d 964, 971 (1998).

Prior to trial, plaintiffs' counsel argued the divorce was irrelevant because the bed-wetting began immediately following the surgery in 2003 and Morgan's parents did not divorce until 2005. We agree. Based on this record, it is clear that the child was suffering from recurrent, nightly episodes of bed-wetting immediately following the surgery in 2003. An event that occurred in 2005 could not have caused this bed-wetting to begin in 2003. Although questions regarding the child's household as it existed in 2003 may have been relevant, a final judgment of dissolution in 2005 is not. Consequently, the 2005 dissolution of Morgan's parents was not probative regarding the cause for the onset of the bed-wetting condition and was not relevant. Accordingly, the trial court erred in allowing defense counsel to question plaintiffs' expert regarding the divorce of Morgan's parents.

Admissibility of Dr. Coplen's Medical Records

Plaintiffs claim that the trial court erred by refusing to admit Morgan's medical records from Dr. Coplen, a subsequent treating physician, into evidence based on hearsay considerations. Plaintiffs offered the records to show that Coplen agreed with plaintiffs' expert, Gibbons, that Morgan suffered trauma from the surgeries and that Morgan's voiding dysfunction was a direct result of trauma from the surgery. As a result, plaintiffs claim they are entitled to a new trial.

31

We disagree.

The initial determination that a "particular statement constitutes hearsay is a legal issue which does not require any exercise of discretion, fact finding, or evaluation of credibility." *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d at 891, citing *People v. Aguilar*, 265 Ill. App. 3d 105, 109 (1994). Thus, a trial court's determination that a particular statement is hearsay is subject to a *de novo* standard of review. *People v. Aguilar,* 265 Ill. App. 3d at 109.

In 1992, the Illinois Supreme Court amended Supreme Court Rule 236 to allow medical records to be treated as a business record. See 145 Ill. 2d R. 236(b), Committee Comments, at cxiv. Accordingly, medical records are admissible "as long as a sufficient foundation is laid to establish that they are business records." *Troyan v. Reyes*, 367 Ill. App. 3d 729, 733 (2006), citing *LoCoco v. XL Disposal Corp.,* 307 Ill. App. 3d 684, 689-90 (1999); *Lecroy v. Miller,* 272 Ill. App. 3d 925, 935 (1995). A moving party must establish that the records were "made in the regular course of any business, and *** was the regular course of the business to make such a *** [memorandum or] record." 145 Ill. 2d R. 236(a).

Here, plaintiff did not establish the foundation for admission as a business record through the testimony of Gibbons, who did not testify that he was familiar with Coplen's record keeping practices. Thus, we conclude the records were not admissible based on this record.

Alternatively, plaintiffs argue that the records are admissible because defendants had possession of the records, prior to trial, through the discovery process. Plaintiffs rely on *Kalalinick v. Knoll*, 97 Ill. App. 3d 660 (1981), in support of this claim. Defendants respond that *Kalalinick* is factually distinguishable from this case.

A review of *Kalalinick* reveals that the disputed business record in that case was a

32

memorandum prepared by one of the employees of the defendant insurance company. On appeal, defendant insurance company claimed that the memorandum was inadmissible because the document was hearsay, irrelevant, did not qualify as a business record, lacked foundation and the author of the memorandum was not identified. However, defendant insurance company did not raise those issues at the trial level, and accordingly, the *Kalalinick* court found the issue waived. *Kalalinick v. Knoll*, 97 Ill. App. 3d at 668. The court went on to say:

> "It was not necessary for the document to qualify as a business record. That hearsay exception is relevant when a party wishes to use its own business record or that of a non-party. Here, however, the plaintiff introduced the statements of the insurer in evidence as admissions by the insurer unfavorable to it. It is firmly established that, as a general rule, any statement, written or not, made by a party or in his behalf which is inconsistent with his present position may be introduced into evidence against him."
> *Kalalinick v. Knoll*, 97 Ill. App. 3d at 668.

We do not find that *Kalalinick* stands for the proposition that because defendants simply possessed the documents in question prior to trial, the documents become admissible at trial. Such an interpretation would contravene the foundational requirements set forth by our supreme court in Rule 236.

## CONCLUSION

The judgment of the circuit court of Peoria County is affirmed in part, reversed in part and remanded to the trial court for a new trial consistent with the terms of this order.

33

Affirmed in part and reversed in part; cause remanded with directions.

O'BRIEN, J. concurs.

JUSTICE CARTER, concurring in part and dissenting in part:

I concur in the majority's analysis and conclusions on the issues, with one exception in the instant case. I have an additional comment regarding the use of exhibit 17 at the trial. I dissent on the issue regarding the examination of the plaintiff's expert regarding bed-wetting.

I agree with the majority's analysis that it was error for the trial court to admit the chart from a medical article as defense exhibit 17 as substantive evidence. The error was compounded when the exhibit was sent to the jury room. Under current Illinois law, the admissibility of information from learned treatises is permitted under both direct examination, as part of the basis of the expert's opinion, and cross-examination, for impeachment, if the information is authenticated as a reliable authority. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §§202.1, 703.1, 705.1, 705.2 (9th ed. 2009). However, in Illinois the information is still not admissible as substantive evidence because of the absence of a "learned treatise" hearsay exception. See Costa v. Dresser Industries, Inc., 268 Ill. App. 3d 1, 11, 642 N.E.2d 898, 905 (1994); Fornoff v. Parke Davis & Co., 105 Ill. App. 3d 681, 690-91, 434 N.E.2d 793, 801 (1982); M. Graham, Cleary & Graham's Handbook of Illinois Evidence §§703.1, 705.1 (9th ed. 2009). Even under Federal Rules of Evidence 803(18), the "learned treatise" hearsay exception, the statements, if admitted and read into evidence, are still not to be received as exhibits. Fed. R. Evid. 803(18).

I dissent from that part of the majority's opinion regarding the plaintiff's claim that the trial court erred by allowing defense counsel to question plaintiff's expert, Gibbons, about whether the parents' divorce may have caused the child's bed-wetting, wherein the majority determined that the

34

evidence was irrelevant. In the instant case, the child's continued bed-wetting is claimed as an aspect of the injury as well as the damage suffered by the child. At the discovery deposition, the expert indicated that family disturbances, such as divorce, could cause bed-wetting. At trial, defense counsel questioned Gibbons regarding alternative explanations for the child's bed-wetting, such as divorce. Although the discovery deposition testimony arguably is not a direct contradiction to the trial testimony, I believe that the prior discovery testimony was sufficiently inconsistent with the trial testimony to allow defense counsel to question the expert on this matter as having a tendency to impeach the witness. See Smith v. Silver Cross Hospital, 339 Ill. App. 3d 67, 72, 790 N.E.2d 77, 81-82 (2003); Ogg v. City of Springfield, 121 Ill. App. 3d 25, 38-39, 458 N.E.2d 1331, 1340-41 (1984); M. Graham, Cleary & Graham's Handbook of Illinois Evidence §§613.2, 705.2 (9th ed. 2009). In addition any permissible kind of impeaching matter is allowed to be developed in cross-examination to test the credibility of a witness or the accuracy of a witness's opinion. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §705.2 (9th ed. 2009). Since the matter of bed-wetting is a fact of consequence and material in this case, I would find it to be error not to allow defense counsel to cross-examine on that point. Thus, I would find that the trial court properly allowed defense counsel to cross-examine the plaintiff's expert on other possible causes of bed-wetting.

For the foregoing reasons, I respectfully concur in part and dissent in part.